[No. 188.   Decided August 1, 1891.]

MILTON L. BAER v. MORAN BROTHERS COMPANY, a Corporation.

PUBLIC LANDS—LOCATION OF VALENTINE SCRIP—TIDE LANDS.

A tract of land, shown by the public surveys to be a portion of the bottom of Elliott Bay, an arm of the sea, and which is covered and uncovered by the flow and ebb of the tide, is not "land," but "water," to which none of the public or special and private land laws of the United States, including the Valentine scrip act, have any application.

As the rule is a fixed one that high water mark is the limit of government grants, the fact that a portion of tide flat is uncovered at low tide, and, in consequence, not covered by navigable water, will not render such tide flat subject to entry under the act of congress (17 St. at Large, p. 649) known as the Valentine scrip act.

*Appeal from Superior Court, King County.*

Action in ejectment by Milton L. Baer against the Moran Brothers Company, a corporation, for a tract of tide land

included within a larger tract selected and located by plaintiff with Valentine scrip. A demurrer to the complaint was sustained, and from the judgment dismissing the action plaintiff appeals.

*Beriah Brown, Jr.,* for appellant.

*J. C. Haines,* for appellee.

The opinion of the court was delivered by

STILES, J. — The appellant brought ejectment for the following described real estate in King county, viz.:

"Beginning at a point 688 feet south and 660 feet west of the east one-quarter post of section six, township twenty-four north, range four east, W. M.; thence west one hundred and fifty feet; thence south two hundred and ten feet; thence east one hundred and fifty feet: thence north two hundred and ten feet, to place of beginning—being the premises covered by Moran Brothers Company's foundry and machine shop."

The complaint showed the plaintiff's ownership of Valentine scrip E, No. 199, for forty acres, and that on the 23d day of September, 1889, "he duly selected the following described tract of unsurveyed land for location thereunder, to wit: Beginning at a point one hundred and sixty rods south of the northeast corner of section six, township twenty-four north, range four east, W. M.; thence west eighty rods; thence south eighty rods; thence east eighty rods; thence north eighty rods, to the place of beginning— containing 40 acres—which said tract of land, when surveyed, will conform to the general system of the United States land surveys, and will be known and designated as the 'northeast quarter of southeast quarter of section six, township twenty-four north, range four east, W. M.'"

The complaint then proceeds:

"12. That this plaintiff selected the said tract of land in the manner following, to wit: On the said 23d day of

39 — 2 WASH.

September, 1889, this plaintiff filed with the register and receiver of the United States land office at Seattle, Washington, a notification that in pursuance of the act of congress approved April 5, 1872, the said plaintiff had selected the said tract of land [describing it], together with an affidavit of this plaintiff to the effect that the said tract of land was not mineral in character, and at the said time and place the said plaintiff filed with the said register and receiver of said United States land office the said piece of scrip, numbered E, No. 199, for cancellation, and tendered to said receiver the sum of two dollars, being the amount of fees allowed by law to the register and receiver of United States land offices in the Territory of Washington, on the entry of forty acres of land with Valentine scrip.

"13. That the said tract of land so selected by said plaintiff was, at the time of its selection by said plaintiff, unoccupied and unappropriated public land of the United States, not mineral, in this: That the said tract of land was situated in the Territory of Washington, was a portion of the tide flats, was covered and uncovered by the flow and ebb of the tide—uncovered at ordinary low tide, and was covered with water at ordinary high tide—and had never been set apart by the United States for any particular use; that the said tract, or any portion thereof, was not in the possession of any person claiming or intending to claim any title thereto under or in pursuance of any statute or treaty of the United States, and the said tracts were not chiefly or at all valuable for mineral, and that the Indian right of occupancy thereto had been extinguished."

A general demurrer to the complaint was sustained in the court below, and, on the plaintiff's refusal to plead further, judgment was rendered for the defendant, dismissing the action. The appellant contends: (1) That the "Act for the relief of Thomas B. Valentine" was a grant upon conditions which have been strictly performed, whereby the title vested, citing *Rutherford v. Greene's Heirs*, 2 Wheat. 198, and other cases involving the construction of congressional donations of public lands. For the purposes of this decision, the proposition may be ac-

cepted without discussion. (2) That on the 23d day of September, 1889, the tract in question was public land of the United States (Washington then being a territory), and that Congress could at all times up to that date dispose of it as it saw fit; citing *Insurance Co. v. Canter,* 1 Pet. 542; *Goodtitle v. Kibbe,* 9 How. 471; *Case v. Toftus,* 39 Fed. Rep. 733. This point, also, may be admitted for the sake of the argument. (3) That said tract, not having been reserved by competent authority, or not occupied in good faith by intending claimants under the United States land laws, was subject to selection by Valentine or his assigns in satisfaction of his grant. Upon this proposition the issue in the case is made, and upon its determination the appeal will succeed or fail.

The act of April 5, 1872 (17 St. at Large, 649), commonly known as the "Valentine scrip act," authorized Thomas B. Valentine, or his legal representatives, in lieu of lands claimed by him in the Rancho Arroyo de San Antonio, in the county of Sonoma, California, to select and have patents for an equal quantity of the unoccupied and unappropriated public lands of the United States, not mineral, and in tracts not less than the subdivisions provided for in the United States land laws, and if unsurveyed when taken, to conform when surveyed to the general system of United States land surveys. The complaint, as above quoted, contains allegations which negative any claim that this tract was occupied or appropriated in pursuance of any statute or treaty of the United States, or was mineral in character, or had been reserved, or was subject to an Indian title. These allegations, and the *pro forma* admissions under the first and second points, strip the case of every defense except that the tract in question was not "public lands," within the meaning of the act of 1872. In our view it was not such land, and for the following reasons:

1. The complaint shows that it is a portion of the tide flats, is covered and uncovered by the flow and ebb of the tide, being uncovered at ordinary low tide, and covered at ordinary high tide; and by reference to the public surveys we find that it is a portion of the bottom, of Elliott Bay, an arm of the sea, in front of the city of Seattle.

2. Within the meaning of the acts of congress, and the policy thereby clearly established from the earliest times, the decisions of courts, and the general understanding, this is not "land," but "water," to which none of the public or special and private land laws, including the Valentine scrip act, have any application. It may be conceded that congress, by clear and explicit enactment, could have granted the bottom of navigable waters to any person it saw fit before the admission of the state, but it will not be contended that the language of the Valentine scrip act is to receive any construction other than that awarded to the hundreds of other acts which relate to the "public lands" subject to Mr. Valentine's selection, or that the lands therein meant are any lands different from those subject to entry under the pre-emption, homestead, and other laws. Therefore it is but proper that, in construing this act, reference should be had in this manner to the hitherto universally sustained rule that "public land" means upland, and not soil beneath navigable waters. The supreme court of the United States, in the case of *Hardin v. Jordan*, 140 U. S. 371 (11 Sup. Ct. Rep. 808), uses the following pointed language:

"It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted; no charge being made for the lands under the bed of the stream, or other body of water. The meander lines run along or near the margin of said waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title

of the grantee to such meander lines. It has frequently been held, both by the federal and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered, and that the waters themselves constitute the real boundary. *Railroad Co. v. Shurmeir*, 7 Wall. 272, and other cases. . . . It has never been held that the lands under water in front of such grants are reserved to the United States, or that they can be afterwards granted out to other persons, to the injury of the original grantees. The attempt to make such grants is calculated to render titles uncertain, and to derogate from the value of natural boundaries, like streams and bodies of waters. With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high water mark, and that the title to the shore and lands under water in front of lands so granted inures to the state within which they are situated, if a state has been organized and established there. Such title to the shore and lands under water is regarded as incidental to the sovereignty of the state—a portion of the royalties belonging thereto, and held in trust for the public purposes of navigation and fishery, and cannot be retained or granted out to individuals by the United States."

In view of such authoritative language, in every event, it would require the most explicit and unmistakable words in an act of congress to cause a court to construe any grant upon tide water to extend beyond high water mark, even though its date were within territorial times, and there were no argument to be made upon the theory of a trust imposed upon the general government for the benefit of the future state. Whatever the theory may be, the fact is that the government never intended to have any grant under its public or private land laws construed to include the soil beneath the waters, and all of its grants are fully and justly satisfied by making them apply to the land, and not to the water.

3. We are urged to consider that this tract is not covered by water navigable in fact, because it is uncovered at

low tide, though it is conceded that the ordinary high tide does cover it, and that the ordinary high water mark is between it and the upland. But the rule is a fixed one that high water mark is the limit of government grants; therefore it can make no difference whether at low tide the area exposed is great or little, or whether the fluctuation of the waters is as great as in the Bay of Fundy, or as slight as at St. Augustine. The high tide is the boundary beyond which there is no land to be granted.

4. Another suggestion is that at various points, some of them within this state, the patents of the government do purport to cover tracts below high water mark; showing the action of the land department in that particular. It may be that there are such patents. The convenience of surveyors may have led them to show meander lines on their plats which do not exactly accord with the sinuosities of the shore; but they are probably errors coming within the maxim *de minimis non curat lex.* If they are more, the answer is that the practice of the land officers in a few cases does not make the law. Such cases are mere mistakes on the part of the government's agents.

5. It is contended that in *San Francisco Savings Union v. Irwin,* 11 Sawy. 667 (28 Fed. Rep. 709), it was held that the title of the State of California to submerged tide flats capable of reclamation by embankments was not based upon her sovereignty, but solely upon the act of 1850 (9 St. at Large, 519), granting swamp and overflowed lands within their borders to the states. But, although the brief asserts that the land in the case of *Savings Union v. Irwin* and that in the case at bar were identical in character, we do not so understand the fact to be. In the former case the controversy was over the possession of "overflowed" lands lying in front of Mare Island, which were sometimes called "tule" or "marsh" lands. They were lands over which the high monthly tides flowed, but not the ordinary daily

tides, and between the island and portions of them there were navigable sloughs. They were more or less covered with vegetation, and were in no sense the bottom of the sea or river. Moreover, the real controversy there was whether a Mexican grant, followed by a United States patent, for "Mare Island, bounded by the water's edge," authorized a subsequent grantee to convey the island, "including all the tule or low and marsh land belonging to the same, or which has ever been reputed or claimed to belong to the same," which the court settled in the negative, citing *United States v. Pacheco,* 2 Wall. 589. It is currently reported that there are thousands of acres of lands in this state of the general character of the lands in the Mare Island case, much of which has been patented by the United States, and is now under a high state of cultivation. But they are not such lands as the daily tides of Elliott Bay cover. They are tide-marsh or prairie lands, composed of alluvial soil, where the interference of the extreme tides or high water caused by wind currents does not prevent a natural growth of vegetation.

6. Lastly, the constitution of this state is appealed to, to show that there is no objection from that source to the appellant's claim. Sec. 2, art. 17 of the constitution declares that "the State of Washington disclaims all title in and claim to all tide, swamp and overflowed lands patented by the United States: *Provided,* The same is not impeached for fraud." There was no occasion for mentioning swamp and overflowed lands, since they were expressly withheld from the state by the enabling act, § 17. Whether the section amounts to a recognition or confirmation of such patents or not, as claimed by appellant, need not be determined. The language is, "disclaims all title." The state merely asserts nothing. But appellant claims that his attempted location of scrip a few days before the constitution went into effect entitles him to share in the disclaimer, since

he may get a patent which will relate to the date of his location. This position in some cases might require a decision of what is meant by "patented" in the section quoted, but it is not necessary here. We have seen from the highest judicial authority that the United States never would, if it could, patent this tract or recognize appellant's claim to it, unless through the mistake of its officers; and no such impossible case was contemplated by the constitution.

The judgment of the superior court is affirmed.

ANDERS, C. J., and SCOTT, DUNBAR, and HOYT, JJ., concur.