[No. 7016.   Decided April 22, 1908.]

BRACE & HERGERT MILL COMPANY, *Appellant*, v. THE STATE OF WASHINGTON, *Respondent*.[1]

NAVIGABLE WATERS—TITLE TO BEDS—RIPARIAN OWNERS—SHORE LAND. The constitutional assertion by the state of ownership in the beds and shores of navigable lakes up to and including the line of ordinary high water vests the title thereto in the state, and the upland owners have no riparian rights therein by virtue of patents from the United States, except that patentees take title up to the meander line if the same was run below high water mark.

SAME—LAKES—NAVIGABILITY. A lake with an area of nine hundred acres, five hundred of which is of a depth of twenty-five feet, used even to a limited extent by the public for navigation, and the shores of which were meandered by the government by lines which did not include the bed of the lake in any of the grants, is a navigable lake.

ADVERSE POSSESSION—AGAINST STATE—SHORE OF NAVIGABLE LAKE —OWNER OF UPLAND. Adverse possession of the bed or shores of a navigable lake below the line of high water does not run against the state, in view of the fact that, after the state's constitutional assertion of title thereto, the legislature passed laws uniformly recognizing the rights of the many persons in possession of such shore lands at the time of the adoption of the constitution, giving them the preference right to purchase the same when the land shall be put on the market, or requiring the purchaser to pay for the value of the improvements thereon; since the possession thereby became permissive.

[1]Reported in 95 Pac. 278.

SAME—PAYMENT OF TAXES. The statute of limitations respecting the adverse possession of land and the payment of taxes for seven years expressly provides that it does not apply as against the state.

SAME—ESTOPPEL. The state is not estopped to assert title to the bed of a navigable lake by the fact that it has permitted improvements thereon by one in possession and stood by while the same was conveyed and taxes were paid for many years.

BOUNDARIES — NAVIGABLE WATERS — SHORES — ASCERTAINMENT. That the true high water mark of a navigable lake was rendered difficult of ascertainment by the acts of one in possession, does not entitle the state to have the same established at the government meander line, where the meander was admittedly many feet distant from the original high water mark; and therefore the state cannot complain of the adoption of a conventional line which is approximately correct.

Cross-appeals from a judgment of the superior court for Thurston county, Linn, J., entered April 29, 1907, upon findings in favor of the defendant, after a trial on the merits before the court without a jury, in an action to quiet title. Affirmed.

*H. A. P. Myers,* for appellant.

*The Attorney General, A. J. Falknor, Assistant,* and *R. G. Sharpe,* for respondent.

FULLERTON, J.—This is an action to quiet title to real property, brought by the Brace & Hergert Mill Company against the State of Washington. In its complaint the mill company alleged that it was the owner in fee simple of the west half of block 94, in D. T. Denny's First Addition to North Seattle; all of block A, in D. T. Denny's Sixth Addition to North Seattle; and all of lot 12, in block 1, and lots 1, 2, 3 and 4, in block 3, of Mercer's Water Front Addition to the city of Seattle; and that it was in the possession of such property, and had been in the open, public, notorious, adverse and actual possession thereof for more than ten years prior to February 26, 1903. It further alleged that the state of Washington claimed some interest in the property described, but that such claim was without right.

The state for answer denied the allegations of the complaint, save the allegation that it claimed the property and the allegation that the mill company was in possession thereof, and for a further and separate answer alleged that all of the lands described in the complaint were shore lands, lying below the line of ordinary high water in the bed of Lake Union, a navigable meandered lake; that such land became its property on its admission into the Union as a state, and that it had never parted with its title to the same. It further alleged that the mill company's possession of the property had not been adverse to it, but in virtue of its laws granting a preference right of purchase to occupants who had placed on such lands, prior to March, 1889, valuable improvements which were in actual use for commerce, trade or business. In reply the mill company deraigned its title, showing that a link therein consisted of a mortgage and its foreclosure in the courts of the United States; that it had paid taxes on the property to the county and state ever since they had been in possession, and alleged again that it had been in adverse possession of the property for the statutory period.

The evidence tended to show that the lands in dispute bordered on the shores of Lake Union, and were platted into lots and blocks as parts of the Donation Land Claims of D. T. Denny and Thomas Mercer. That lot 12, in block 1, and lots 1, 2, 3 and 4 of Mercer's addition were wholly in the bed of Lake Union, below the line of ordinary high water mark as it exists at the present time; that the west half of block 94 of Denny's addition is entirely above that line; that block A of the same addition is partly above and partly below such line. It appeared also that Lake Union is a freshwater lake of irregular shape, having an extreme length north and south of some two and one-fourth miles, with an extreme width of about seven-eighths of a mile; that it has a total area of some 905 acres, some 499 acres of which has a depth of over 25 feet, with a maximum depth of 60 feet. Boats of considerable dimensions, as well as many smaller craft, have

at different times plied upon its waters; booms of logs, piles, shinglebolts and other timber products have been transported from place to place thereon, as well as moored in booms while awaiting the process of manufacture.

In 1852 or 1853, a dam was thrown across the outlet of the lake, causing the waters therein to rise some 11 feet above its general level. While this dam was still standing, a meander line was run to mark the shore line of the Denny and Mercer Donation land claims. This meandered line shows the shore line to have been entirely south of block 94, leaving the entire property in question in this action in the bed of the lake below the line of high water mark. A second meander line, also run by the government surveyors, although it does not strictly correspond with the first, shows the same thing; but the recorded plats of Denny's Additions show the shore line to pass through block 94 somewhere near the center of the block, leaving the north half of block 94, with the other described lands, below the line of ordinary high water. The dam mentioned went out in part some few years after its construction and was not rebuilt, and later on the balance of it went out, leaving the water level of the lake substantially as it was originally.

The present shore line, as found by the court, lies entirely below block 94, passing through block A in a diagonal direction, running from a point 30 feet north of the southwest corner of the block to a point 170 feet north of its southeast corner. On the question of possession, the evidence tended to show that the lands in dispute had been in the possession of the mill company and its predecessors in interest since early in territorial days, and there was evidence, although not uncontradicted, that the owners claimed adversely to the state for a period of more than ten years prior to February 27, 1903, the date the act relieving the state from the operation of the general statute of limitations went into effect. It was further shown that the mill company, and its predecessors in interest, had placed improvements upon the lands in question

having an aggregate value of some $85,000, and that a considerable part of such improvements were upon that part of the land the court found to be shore lands. It was shown also that these, as well as some of the adjoining lands, had been filled to a considerable depth by the mill company, and that its action in this regard made it difficult if not impossible to trace with precision the shore line as it originally existed, or would now exist but for such fills.

On the foregoing record the trial court found that Lake Union was a navigable body of water the property to the beds and shores of which was in the state of Washington; that the line of ordinary high-water marked the boundary between the uplands and the shore lands, rather than the meander line run by government surveyors; that the mill company had acquired no title to the shore lands by its possession; that the state had acquired no title to the lands lying between the shore line and the meander line as the court had located it; that, of the lands in dispute, all of block A that lay to the north of that line, together with lot 12, in block 1, and lots 1, 2, 3 and 4 of Mercer's Water Front Addition to the city of Seattle, were shore lands belonging to the state of Washington, and that all of block A lying south of the line described, together with the west half of block 94, were uplands and the property of the mill company. It entered a decree in accordance therewith, from which both parties appeal.

Taking up the questions suggested by the appeal of the mill company, the first to be noticed is the contention that the property in dispute, both above and below the line of ordinary high water of the lake, passed by the patents from the government of the United States to Denny and Mercer, and from them by mesne conveyances to the mill company. In other words, the contention is that the upland owner on a navigable body of water has, in virtue of his patent from the United States, the right of a riparian proprietor in the water on which his lands borders—a right which the state cannot by

its laws take away. This question, in so far as it is within
the powers of the courts of this state to determine it, has been
determined against the appellant's contention. In its consti-
tution the state asserted ownership in the beds and shores of
all navigable waters of this state up to and including the line
of ordinary high tide in waters where the tide ebbs and flows,
and up to and including the line of ordinary high water
within the banks of all navigable rivers and lakes. By a uni-
form course of decision this court has held that this declara-
tion vested title in the lands claimed in the state. It was so
held with reference to the tide lands in the following cases:
*Eisenbach v. Hatfield,* 2 Wash. 236, 26 Pac. 539, 12 L. R. A.
632; *Pierce v. Kennedy,* 2 Wash. 324, 26 Pac. 554, 28 Pac.
35; *Baer v. Moran Brothers Co.,* 2 Wash. 608, 27 Pac. 470;
*Board of Harbor Line Com'rs v. State ex rel. Yesler,* 2 Wash.
530, 27 Pac. 550; *State ex rel. Stimson Mill Co. v. Board of
Harbor Line Com'rs,* 4 Wash. 6, 29 Pac. 938; *State ex rel.
Columbia & P. S. R. Co. v. Board of Harbor Line Com'rs,*
4 Wash. 816, 30 Pac. 734; *Morse v. O'Connell,* 7 Wash. 117,
34 Pac. 426; *Allen v. Forrest,* 8 Wash. 700, 36 Pac. 971, 24
L. R. A. 606; *Lownsdale v. Grays Harbor Boom Co.,* 21
Wash. 542, 58 Pac. 663; *Sullivan v. Callvert,* 27 Wash. 600,
68 Pac. 363. And with reference to shore lands, or lands on
which the tide did not ebb and flow, in the following cases:
*McCue v. Bellingham Bay Water Co.,* 5 Wash. 156, 31 Pac.
461; *Washougal & La Camas Transp. Co. v. Dalles etc. Nav.
Co.,* 27 Wash. 490, 68 Pac. 74; *Kalez v. Spokane Val. Land
etc. Co.,* 42 Wash. 43, 84 Pac. 395; *Van Siclen v. Muir,* 46
Wash. 38, 89 Pac. 188; *Muir v. Johnson, ante* p. 66, 94
Pac. 899.

The statement that the line of ordinary high water marks
the boundary of the upland grant is of course understood
with the modification that the meander line established by the
government does not run below that line; we have held, in
obedience to another clause of the constitution disclaiming
title in tide and shore lands where the same had been patented

prior to the adoption of the constitution, that, where it does run below the line of ordinary high water, such line marks the boundary of the upland grant. *Scurry v. Jones*, 4 Wash. 468, 30 Pac. 726; *Cogswell v. Forrest*, 14 Wash. 1, 43 Pac. 1098; *Washougal & La Camas Transp. Co. v. Dalles etc. Nav. Co.*, and *Van Siclen v. Muir, supra*. But subject to this modification, the rule is unqualified that the upland owner as such has no proprietary interest in the tide or shore lands bordering such uplands.

It is said, however, that the decisions of this court are in violation of the Federal laws under which the lands were granted to the upland owner; but we cannot so regard them. Unquestionably, the supreme court of the United States has uniformly held that grants of uplands bordering on navigable waters convey to the grantee title down to the line or ordinary high water of such navigable waters, but they have just as uniformly held that the answer to the question whether it conveys more than this, depends upon the local law of the state wherein the granted lands lie. If the local law recognizes such grants as extending to low water mark or to the thread of the stream, it will be so recognized by the Federal authorities; but if the state limits the grant to the line of ordinary high water, as our state does, this line will be held to mark the boundary of the grant. This is founded on the principle that the shores and beds of all bodies of water, whether navigable or unnavigable, belong to the state on which they are situate, and that it is for the state to say whether or not it will assert its title to such shores and beds, or whether it will surrender them to the upland proprietor. *Barney v. Keokuk*, 94 U. S. 324, 24 L. Ed. 224; *Packer v. Bird*, 137 U. S. 661, 11 Sup. Ct. 210, 34 L. Ed. 819; *St. Louis v. Rutz*, 138 U. S. 226, 11 Sup. Ct. 337, 34 L. Ed. 941; *Hardin v. Jordan*, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428; *Shively v. Bowlby*, 152 U. S. 1, 14 Sup. Ct. 548, 38 L. Ed. 331. This state, as we have shown, asserted its right to these shores and beds of its navigable waters in its

constitution. There can be, therefore, no question that its right thereto is paramount to any claim made by an upland owner in virtue of his patent from the United States.

The next contention is that Lake Union is not navigable in fact, and for that reason the grant of the uplands extended to the center of the lake. But on this question we likewise entertain no doubt. That the lake is capable of being navigated there is no question at all—the claim that it is not navigable being based on the fact that its size renders it of but little use for the purposes of navigation. But the fact that it is not much used does not conclude the question. Since it is capable of being navigated and is used by the public for that purpose, even though to but a limited extent, the courts cannot say that the private rights of the upland owners are superior to the rights of the general public therein. More over, there is no equity in the claim of the upland owner. The government did not extend its surveys across the lake, nor did it include the bed of the lake in any of the grants made of the upland surrounding it. On the contrary, the government, when it disposed of the soil surrounding the lake, treated the lake as a navigable body of water, the title to the bed and shores of which it held in trust for the future state of Washington, and, in so far as it could do so, it passed the title to these beds and shores to the state of Washington on its admission into the Union as little encumbered by the rights of the surrounding property owners as it did any others of the tide and shore lands. *Madson v. Spokane Valley Land etc. Co.*, 40 Wash. 414, 82 Pac. 718, 6 L. R. A., N. S., 5; *Kalez v. Spokane Valley Land etc. Co.*, 42 Wash. 43, 84 Pac. 395.

The appellant next contends that it has title under the statute of limitations. By the general statute of limitations, brought over from territorial days, it was provided that actions for the recovery of real property, or for the recovery of the possession thereof, must be brought within a period of

ten years.   Bal. Code, § 4797 (P. C. § 280).   Another section, from the same source, reads as follows:

"The limitations prescribed in this chapter shall apply to actions brought in the name of the state, or any county or other public corporation therein, or for its benefit, in the same manner as to actions by private parties.   An action shall be deemed commenced when the complaint is filed."   Bal. Code, § 4807 (P. C. § 291).

The section first cited is still the law of the state, and the latter continued to be until February 27, 1903, when it was amended so as to read as follows:

"The limitations prescribed in this act (chapter) shall apply to actions brought in the name or for the benefit of any county or other municipality or *quasi* municipality of the state, in the same manner as to actions brought by private parties:   *Provided,* That there shall be no limitation to actions brought in the name or for the benefit of the state, and no claim of right predicated upon the lapse of time shall ever be asserted against the state:   *And further provided,* That no previously existing statute of limitation shall be interposed as a defense to any action brought in the name of or for the benefit of the state, although such statute may have run and become fully operative as a defense prior to the adoption of this act, nor shall any cause of action against the state be predicated upon such a statute.   An action shall be deemed commenced when the complaint is filed."   Laws 1903, p. 26.

It is at once apparent that, if it was within the power of the state to remove the bar of the statute by legislative act after the bar had become perfect, the appellant has no standing on this branch of its case, as it is clear that the legislature by this act attempted to do that very thing.   But since the appellant denies to the state that power, we will not examine the question, as there is another ground free from any constitutional objection on which a decision against the contention may rest.   That ground is that the statute upon which the appellant relies is not applicable to this character of property.   The statute of limitations, it must be remembered, does not run against the state except with the state's

consent. When the state acquired its tide and shore lands on
its admission into the Union, it found them in a large part in
the possession of individuals who had erected and were main-
taining thereon structures of various sorts, many of which
were costly and valuable. Some of them were of a public
nature, such as wharves, docks and warehouses, useful to the
public as an aid to trade and commerce. Others again were
of a private nature, such as sawmills, shingle mills, and struc-
tures in which were manufacturies of various sorts; and still
others, again, were mere highways from the upland to deep
water. After the state had asserted its title to these lands,
the legislature recognized that these persons had substantial
rights in their improvements which were entitled to protec-
tion, and to that end it gave them preference rights of pur-
chase when the land should be put on the market for sale. It
provided, furthermore, that when such lands should be pur-
chased by one not the owner of the improvements, the pur-
chaser should pay the value of the improvements to the state
for the use of the owner as an additional part of the purchase
price. While no specific enactment on the subject of posses-
sion was made, the statute uniformly recognized this right to
be in the owner of the improvements. For example, § 11 of
the Laws of 1889-90, page 435, the first enactment upon the
subject, reads as follows:

"The owner or owners of any lands abutting, or fronting
upon, or bounded by the shore of the Pacific ocean, or of any
bay, harbor, sound, inlet, lake or watercourse shall have the
right for sixty (60) days following the filing of the final
appraisal of the tide lands to purchase all or any part of
the tide lands in front of the lands so owned: *Provided*,
That if valuable improvements in actual use for commerce,
trade or business have been made upon said tide lands by any
person, association or corporation, the owner or owners of
such improvements shall have the exclusive right to purchase
the land so improved for the period aforesaid."

The act of 1895, § 74, page 559, the first reenactment of
the statutes, contained the following:

"Any person the owner of the abutting upland [to shore lands] shall have the preference right for sixty days following the filing of the plat and appraisement with the commissioner of public lands, to purchase the lot or block of land in front of the upland so owned by him: *Provided,* That if valuable improvements were, prior to March 26, 1890, in actual use for commerce, trade or business, made on any lands, the owner or owners of such improvements shall have, for the period aforesaid, the exclusive right of purchase during the period aforesaid of the lands so improved, and sufficient additional ground for the reasonable use of said improvements."

And the act of 1897, page 250, § 45, the law now in force, contains this provision:

"The owner or owners of lands abutting or fronting upon tide or shore lands of the first class shall have the right for sixty days following the filing of the final appraisal of the tide and shore lands with the commissioner of public lands to apply for the purchase of all or any part of the tide or shore lands in front of the lands so owned: *Provided,* That if valuable improvements, and in actual use prior to March 26, 1890, for commerce, trade, residence or business have been made upon said tide or shore lands by any person, association or corporation, the owner or owners of such improvements shall have the exclusive right to apply for the purchase of the land so approved for the period aforesaid. . . ."

These statutes, it seem to us, when considered in connection with the conditions existing at the time of their enactment, evidence a clear intent on the part of the legislature that improvers of tide and shore lands shall not be disturbed in the possession of their improvements until the land on which the improvements are situated has been placed on the market for sale, and the time given them within which to exercise a preference right of purchase has expired. And this being true, it must follow that the state intended such possession to be permissive until such time; that it intended to withdraw, in so far as these lands were concerned, the consent formerly given that the general statute of limitations should operate against it. Therefore, since the lands in question were finally appraised and placed on the market for sale about the time

this action was commenced, the statute had not run in the appellant's favor.

Nor is the appellant aided by the statute relating to possession under color of title and the payment of taxes for seven consecutive years. That statute expressly provides that it "shall not extend to lands or tenements owned by the United States, or this state, nor to school lands, nor to lands held for any public purpose." Laws 1893, page 20.

Lastly, it is asserted that the state is estopped from asserting title to the property in question. This contention is founded on the fact that the state has not interfered with the appellant's use of the property, but has stood by and raised no question while the appellant and its predecessors in interest have mortgaged and sold the property, paid taxes thereon, and otherwise treated it as their own. But acts of this character do not amount to an estoppel as against the state. The state at all times has recognized that the appellant had a property in its improvements, and this property it recognized the right to dispose of as it pleased. The improvement was property subject to taxation, and it could be no waiver of the state's title to the land to assess and collect taxes upon the appellant's interests therein. If the authorities sought to tax the appellant for something it did not own, the proper remedy was to object before the taxing board.

The state appeals from the judgment of the court establishing the line of ordinary high water, as it found it to exist at the present time, as the boundary line between the shore and the uplands. This line, as we have before stated, could not be determined with accuracy, owing to the fact that the mill company and their predecessors in interest had obscured it by fills which raised the surface above the present water level. The state contends that since the true line cannot be definitely known because of those acts of the mill company, the court should have adopted the government meander line as the true line, in which event all of the land in dispute will be found within the boundaries of the state's property. But the me-

ander line is concededly many feet from the true line, while the line adopted by the court is approximately upon it. The fill complained of did not obscure the line entirely; it simply made it difficult to follow its sinuosities, resulting in the adoption by the court of a conventional line between the two points in dispute. As there is no evidence that the state is the loser by this rule of the court, we see no necessity for disturbing it.

The judgment appealed from is affirmed.

HADLEY, C. J., MOUNT, CROW, and ROOT, JJ., concur.