IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| PAUL MICHEL and ANN MICHEL, husband and wife; JOHN W. MERRIAM and BRENDA K. WALKER, husband and wife, | ) ) ) ) ) | No. 82073-7-I consolidated with No. 82074-5-I |
| Respondents, | ) ) | |
| v. | ) ) | |
| CITY OF SEATTLE, a Washington municipality, d/b/a SEATTLE CITY LIGHT, | ) ) ) ) | PUBLISHED OPINION |
| Appellant. | ) ) ) | |

VERELLEN, J. — When the legislature enacted RCW 7.28.090, it shielded municipal "lands held for any public purpose" against being taken by adverse possession. The common law rule of nullum tempus occurrit regi (no time runs against the king) shields only those lands used in a governmental capacity and is narrower than this statutory immunity because RCW 7.28.090 prevents the loss of municipal lands actually being used or planned for use to provide any direct or indirect benefit to the public.

The trial court granted summary judgment against the City of Seattle (City) and allowed portions of its land to be taken by adverse possession. It concluded the land could be taken by adverse possession because it was used for a proprietary purpose and so was not held in a governmental capacity. The trial court should have applied the broader statutory "held for any public purpose" test.

On de novo review, we conclude that the City holds title to the entirety of tract 44 and that RCW 7.28.090 applies and shields the disputed property from adverse possession by the homeowners.

Therefore, we vacate the trial court's order and remand for further proceedings in accordance with this opinion.

FACTS

In the early 1900s, the Wenzlers and the Mehlhorns owned tract 44, a long, 100-foot wide lot adjacent to Echo Lake in Shoreline, as appears below. In 1905, they executed a "right of way deed" in favor of the Seattle-Everett Interurban Railway Company, letting it use tract 44 as a railway.[1] If tract 44 stopped being used as a railway, then ownership would revert to the original owners and their heirs or assigns. Over the next 25 years, ownership of tract 44 changed numerous times. In 1939, it stopped being used as a railway. In 1945, it was conveyed to the Puget Sound Power & Light Company. And in 1951, Puget Sound Power & Light conveyed tract 44 to the City, which managed the tract through Seattle City Light.

By 2018, the lots adjacent to tract 44 had been subdivided and developed. Married couples, the Michels[2] and the Merriams[3] (homeowners), lived on neighboring lots between Echo Lake and tract 44. The homeowners' fenced front

---

[1] Clerk's Papers (CP) at 445.

[2] Paul and Ann Michel.

[3] We refer to John Merriam and Kaye Walker as "the Merriams," which the trial court did as well.

yards, the disputed properties, are located in tract 44. The nearest street runs along tract 44. A map appears below, identifying the homeowners' properties and tract 44.



In June of 2018, the City sent a letter to the Michels stating their fence and other "encroachments" on tract 44 had to be removed.[4] It sent a similar letter to the Merriams in October of 2018. The Michels and the City did not negotiate a solution. In November, the City removed most of the Michels' fence. The

---

[4] CP at 174.

homeowners filed separate quiet title actions against the City, alleging they possessed their fenced front yards. The City counterclaimed in each case, seeking to quiet title and eject the homeowners. The cases were consolidated.

During discovery, the homeowners learned of the restrictive 1905 right-of-way deed and moved for partial summary judgment on the City's ability to claim ownership of tract 44 by deed. The court agreed, dismissing the City's counterclaims except to the extent they were based on adverse possession by the City.[5]

Following discovery, the parties filed amended complaints. The Michels brought claims for adverse possession, quiet title, and for a prescriptive easement for access against the City and all putative owners.[6] They also brought claims for trespass and conversion against the City. The Merriams brought claims for adverse possession and for a prescriptive easement for access against the City and all putative owners. The City brought claims for adverse possession against the homeowners and against any heirs or assigns of the original owners of tract 44.

The parties filed cross motions for summary judgment. The City argued that it took the entirety of tract 44 by adverse possession and that RCW 7.28.090 barred the homeowners from adversely possessing the disputed property because it was using the land for a public purpose. The homeowners contended that the

[5] The City does not seek review of this decision.

[6] Because the 1951 conveyance was ineffective, the heirs and assigns of the Wenzlers and Mehlhorns were joined as defendants. Most did not appear. The sole heir/assign who actively litigated is not a party to this appeal.

4

City did not take their fenced yards by adverse possession because it "has never occupied or even used [them]"[7] and that the City's land was not shielded from adverse possession because, as a matter of law, a municipality providing utility services is not acting in a governmental capacity.

The court concluded that the City adversely possessed tract 44 as of 1961, except for the disputed properties.[8] It concluded the City had not held tract 44 in a governmental capacity, so RCW 7.28.090 did not shield it from being adversely possessed. The court held the Merriams took title to their disputed property in 1963, and the Michels took title to their disputed property in 1974. It also granted both homeowners prescriptive easements for access.[9] The City filed a motion for reconsideration, which the court denied.

The City appeals.

## ANALYSIS

When parties file cross motions for summary judgment, questions of law determine the outcome if there are no genuine issues of material fact.[10] We engage in de novo review of the trial court's rulings.[11] Determinations by the trial

---

[7] CP at 1220.

[8] CP at 1395.

[9] CP at 1395-96.

[10] Tiger Oil Corp. v. Dep't of Licensing, State of Wash., 88 Wn. App. 925, 929-30, 946 P.2d 1235 (1997).

[11] Lakehaven Water & Sewer Dist. v. City of Fed. Way, 195 Wn.2d 742, 752, 466 P.3d 213 (citing Watson v. City of Seattle, 189 Wn.2d 149, 158, 403 P.3d 1 (2017); Okeson v. City of Seattle, 150 Wn.2d 548, 78 P.3d 1279 (2003)), affirmed, 195 Wn.2d 742 (2020).

court are not entitled to any deference.[12]

The core question raised on appeal is whether the City is shielded by RCW 7.28.090 from the homeowners' claims of adverse possession to their fenced yards, the disputed portions of tract 44.[13]  The homeowners argue the statute is inapplicable because of its narrow scope or because the City did not use tract 44 for a public purpose.  But, as a preliminary matter, we address the homeowners' contention that the City never acquired ownership of the disputed properties.

The homeowners challenge the City's claim that it acquired title to the disputed properties by adverse possession as of 1961.  Specifically, they argue an adverse possessor has actual and exclusive possession of a disputed property only when they have actual, physical possession,[14] and the City "never established exclusive possession of the portions of [tract] 44 occupied by the Michels and the Merriams and their predecessors" because it "never possessed the area inside the [homeowners'] fence line."[15]  The homeowners do not dispute that the City took title to the rest of tract 44 by adverse possession.

A person claiming adverse possession under RCW 4.12.020 must prove they "possess[ed] the property for at least 10 years in a manner that is '(1) open

---

[12] Brinkerhoff v. Campbell, 99 Wn. App. 692, 699, 994 P.2d 911 (2000).

[13] The homeowners do not dispute that the City adversely possessed the rest of tract 44.  Michel Resp't's Br. at 25.

[14] Merriam Resp't's Br. at 24.

[15] Michel Resp't's Br. at 25.

and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile.'"[16] The homeowners' narrow arguments challenge only the elements of actual and exclusive possession.[17]

The homeowners misconstrue the meanings of "possession" and "exclusive," and they cite no authority requiring physical occupation of the entirety of a disputed property to prove "actual" and "exclusive" use. While "it is not possible to be in adverse possession without physical occupation,"[18] "[t]he ultimate test is the exercise of dominion over the land in a manner consistent with actions a true owner would take."[19] "Adverse possession must be as exclusive as one would expect of a titled property owner under the circumstances."[20] "[T]he exclusivity element means that an adverse possessor may not share possession of the area claimed with the true owner and, though less critical, not too much with third persons who are there without the adverse possessor's consent."[21]

The City has maintained a continuous physical presence on tract 44 since 1951, using it for electrical distribution with power poles. Nothing shows the City

---

[16] Gorman v. City of Woodinville, 175 Wn.2d 68, 71-72, 283 P.3d 1082 (2012) (quoting ITT Rayonier, Inc. v. Bell, 112 Wn.2d 754, 757, 774 P.2d 6 (1989)).

[17] The homeowners' arguments are expressly limited to whether the City lacked physical possession and control over the entirety of tract 44. Michel Resp't's Br. at 23; Merriam Resp't's Br. at 28-30.

[18] 17 WILLIAM B. STOEBUCK AND JOHN W. WEAVER, WASHINGTON PRACTICE: REAL ESTATE: PROPERTY LAW § 8.9, at 517 (2d ed. 2004).

[19] ITT Rayonier, 112 Wn.2d at 759.

[20] Harris v. Urell, 133 Wn. App. 130, 138, 135 P.3d 530 (2006) (citing Crites v. Koch, 49 Wn. App. 171, 174, 741 P.2d 1005 (1987)).

[21] 17 STOEBUCK AND WEAVER, supra, § 8.19, at 541 (emphasis added).

shared possession of tract 44 with the "true owners," the Wenzlers, the Mehlhorns, and their heirs or assigns. The City consented to third persons' uses of tract 44 for road access, recreation, parks, and trails. Although possession of tract 44 was not literally exclusive, as the homeowners would require, the record shows the City managed the land as a true owner would under the circumstances.

Tract 44 is a 100-foot wide parcel that cuts off the Michels' and Merriams' properties from the road. In 1951, the City took possession of and actively managed the uses of tract 44. It granted permits, charging only a nominal fee, to the homeowners' predecessors for use of tract 44 to garden and access the road. The temporary permits issued in the 1950s and 1960s did not prohibit the construction of fences, driveways, or temporary structures, such as a shed. The City required that it be allowed to access the homeowners' property within tract 44 "at all reasonable times" to ensure compliance with the permitted uses.[22] And, as discussed in more detail below, the City managed other third parties' access to and uses of tract 44, including lake access, fishing, and other recreation.

From 1951 to 1961, the City physically occupied tract 44 and exercised exclusive control over it, managing third parties' uses. The City exercised dominion and control over the entirety of tract 44 as a true owner would. Because the City took the entirety of tract 44, including the portions within the homeowners' fence lines, the trial court erred by concluding the City did not take title to the disputed properties.

---

[22] CP at 754.

Next, we turn to the core question: Whether the City was shielded from the homeowners' claims that they adversely possessed the disputed areas after the City took title to all of tract 44.

We review issues of statutory interpretation de novo.[23] Statutes are interpreted to "'ascertain and carry out the [l]egislature's intent.'"[24] If a statute's meaning is plain and unambiguous, "then the court must give effect to that plain meaning as an expression of legislative intent."[25] "To interpret a statute's plain language, we examine the text of the statute, 'as well as the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole.'"[26] We interpret statutes to avoid unlikely, strained, or absurd consequences.[27]

In Washington, adverse possession primarily applies through statutes of limitation, and courts have worked out the elements of the doctrine as "a kind of

---

[23] Kiely v. Graves, 173 Wn.2d 926, 932, 271 P.3d 226 (2012) (citing Lake v. Woodcreek Homeowners Ass'n, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010); Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wn.2d 873, 880, 73 P.3d 369 (2003)).

[24] Cent. Puget Sound Reg'l Transit Auth. v. WR-SRI 120th N. LLC, 191 Wn.2d 223, 233, 422 P.3d 891 (2018) (quoting Dep't of Ecology v. Campbell & Gwinn, L.L.C., 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002)).

[25] Campbell & Gwinn, 146 Wn.2d at 9-10 (citing State v. J.M., 144 Wn.2d 472, 480, 28 P.3d 720 (2001)).

[26] Cent. Puget Sound Reg'l Transit Auth., 191 Wn.2d at 234 (internal quotation marks omitted) (quoting State v. Larson, 184 Wn.2d 843, 848, 365 P.3d 740 (2015)).

[27] In re Wieber, 182 Wn.2d 919, 927, 347 P.3d 41 (2015) (citing Kilian v. Atkinson, 147 Wn.2d 16, 21, 50 P.3d 638 (2002)).

judicial gloss on the statutes of limitation."[28]  Most claims of adverse possession are based upon RCW 4.16.020, which creates a 10-year limitations period.[29] There are also two statutes that authorize adverse possession claims with a seven-year limitation period: RCW 7.28.070[30] and RCW 7.28.080.[31]  Another statute, RCW 7.28.090, immunizes certain government lands against a claim of adverse possession.  RCW 7.28.090 provides, "RCW 7.28.070 and 7.28.080 shall not extend to lands or tenements owned by the United States or this state, nor to school lands, nor to lands held for any public purpose."[32]

The homeowners argue that because they claim to have adversely possessed tract 44 under the 10-year limitations period set by RCW 4.16.020, RCW 7.28.090 is inapplicable.[33]  The homeowners' interpretation is not persuasive.

---

[28] 17 STOEBUCK AND WEAVER, supra, §§ 8.1-8.2, at 505-07; see Gorman, 175 Wn.2d at 76 ("[A]s it has developed in our state, the doctrine [of adverse possession] is not entirely a creature of the common law.") (Madsen, J., concurring).

[29] 17 STOEBUCK AND WEAVER, supra, § 8.2, at 506-07.

[30] The "payment of taxes" statute allows adverse possession if, for seven years in addition to meeting the common law elements, the possessor "(1) has 'color of title,' (2) has paid all taxes levied on the land for seven successive years, and (3) believes in 'good faith' that he has title.  Id. at 507.

[31] The "vacant land statute" is unusual in that it is not an adverse possession statute, and the statute is unavailable if the person possesses the land.  Id. at 508. "To prevail under this section, the claimant must (1) have color of title, (2) be in good faith, and (3) pay all taxes assessed for seven successive years; and of course (4) the land must be 'vacant and unoccupied.'"  Id.

[32] (Emphasis added.)

[33] Michel Resp't's Br. at 33-37; Merriam Resp't's Br. at 12-15.

The legislature expressly directed that RCW 7.28.090 "be liberally construed for the purposes set forth" in it.[34]  Courts have applied this liberal construction directive by concluding RCW 7.28.090 applies even when a plaintiff does not rely on either RCW 7.28.070 or .080.  In Skinner v. McCrackan, the Supreme Court concluded RCW 7.28.090 limited the plaintiff's claim for betterment damages under RCW 7.28.160 because the United States held title to the land when many of the improvements were made, and a claim for betterment damages requires the ability to claim adverse possession of the improved land.[35]  Similarly, in Pioneer National Title Insurance Company v. State, this court relied on RCW 7.28.090 to conclude a claim for betterment damages could not be made against the state.[36]  Neither case implicated RCW 7.28.070 or .080.  Courts have also concluded RCW 7.28.090 prohibits prescriptive easements from lying against government-held land, even though easements are not mentioned in RCW 7.28.070 or .080.[37]

---

[34] RCW 7.28.100.

[35] 93 Wash. 43, 45-46, 159 P. 977 (1916).  Technically, the court held Rem. Rev. Stat. § 790 limited the claim for betterment damages brought under Rem. Rev. Stat. § 797.  Id. at 45.  But because those laws are substantively identical to their current counterparts, we refer to the current statutes.

[36] 39 Wn. App. 758, 695 P.2d 996 (1985).

[37] E.g., Williams Place, LLC v. State ex rel. Dep't of Transp., 187 Wn. App. 67, 98, 348 P.3d 797 (2015) ("'[P]rescriptive easements do not lie against the state.'") (alteration in original) (quoting Northlake Marine Works, Inc. v. State, Dep't of Nat. Res., 134 Wn. App. 272, 291 n.12, 138 P.3d 626 (2006) (citing RCW 7.28.090)).

Kiely v. Graves also supports a broad reading of RCW 7.28.090.[38] In Kiely, the Supreme Court concluded "RCW 7.28.090 precluded adverse possession of" a public alley in Port Orchard "while it was held for a public purpose."[39] Two neighboring families, the Kielys and the Graveses, lived adjacent to a public alley.[40] The Kielys' house encroached on a portion of the alley.[41] In 2008, the Graveses made an agreement with Port Orchard to take possession of the entire alley. In 2009, Port Orchard vacated the alley and conveyed it to the Graveses.[42] The Kielys filed a complaint against the Graves family alleging adverse possession of the alley.[43]

The Kielys argued that they possessed the entire alley and that RCW 7.28.090 did not apply because Port Orchard possessed an easement only.[44] The Graveses argued that "RCW 7.28.090 precludes adverse possession of land owned by the government."[45] The court agreed with the Kielys that the municipality had held an easement and not fee simple title.[46] But it broadly interpreted the phrase "lands held for any public purpose" as covering public easements dedicated for a public thoroughfare, thereby "barring adverse

---

[38] 173 Wn.2d 926, 271 P.3d 226 (2012).

[39] Id. at 927-28.

[40] Id. at 928.

[41] Id.

[42] Id. at 929.

[43] Id.

[44] Id. at 930.

[45] Id.

[46] Id. at 935.

possession claims against the property."[47]  Because "[a] party may not claim adverse possession of property held or controlled by a municipality for public use"[48] and the Kielys' use of the alley "interfered with the public's potential or actual use of the easement[,] RCW 7.28.090 prohibited the Kielys from obtaining title to the alley through adverse possession."[49]  Neither RCW 7.28.070 nor .080 were the basis for adverse possession claims at issue in Kiely.

The liberal construction required of RCW 7.28.090 reveals the legislature's intent to broadly shield qualifying land from any form of adverse possession. Other than their narrow interpretation of the statute, the homeowners cite no contrary authority.  And adopting the homeowners' interpretation would undermine the purpose of RCW 7.28.090.  If a plaintiff met the requirements in RCW 7.28.070, the "payment of taxes" statute, to adversely possess land held for a public purpose but waited until the 10-year limitations period ran, then they could avoid RCW 7.28.090 by bringing their claim under RCW 4.16.020.  The legislature would not intentionally undermine one enactment with another.[50]  Recognizing the broad scope of RCW 7.28.090 harmonizes it with RCW 4.16.020.  Because the legislature intended to broadly shield government-held land, RCW 7.28.090 can

---

[47] Id. at 936.

[48] Id. at 935-36 (citing Gustaveson v. Dwyer, 83 Wash. 303, 304-05, 145 P. 458 (1915)).

[49] Id. at 940.

[50] See Wieber, 182 Wn.2d at 927 (statutes are interpreted to avoid unlikely or absurd consequences) (citing Kilian, 147 Wn.2d at 21).

apply to adverse possession claims brought against a government entity under RCW 7.28.070, .080, or RCW 4.16.020.

Because RCW 7.28.090 can apply, the question is whether it applies here. The statute prohibits any claim of adverse possession against "lands held for any public purpose." The issue is how to identify land "held for any public purpose."

RCW 7.28.090 was enacted in 1893 and has remained substantively unchanged since then.[51] At the time, the common law rule nullum tempus occurrit regi was held to apply to certain government-owned land in the United States, preventing adverse possession by ensuring the limitations period never ran.[52] States were divided over whether this rule shielded municipalities.[53] In 1905, our Supreme Court relied upon the common law to state "[t]he general rule that a party cannot acquire title by adverse possession to property held by a municipality in its governmental capacity for public purposes," concluding a street held by a

---

[51] See Kiely, 173 Wn.2d at 935 ("RCW 7.28.090 has remained unchanged during all times relevant to this case" from 1908 through 2012.) (citing Brace & Hergert Mill Co. v. State, 49 Wash. 326, 95 P. 278 (1908)); see also LAWS OF 1893, ch. 11 § 5 ("The [equivalents to RCW 7.28.070 and .080] shall not extend to lands or tenements owned by the United States or this state, nor to school lands, nor to lands held for any public purpose.").

[52] See, e.g., United States v. Thompson, 98 U.S. 486, 25 L. Ed. 194 (1878) (explaining the common law rule meant state statutes of limitation could not run against the United States without its consent); Almy v. Church, 18 R.I. 182, 26 A. 58 (1893) (relying on the common law rule to conclude a public road held by a town could not be taken by adverse possession); City of Ft. Smith v. McKibbin, 41 Ark. 45 (1883) (concluding the common law rule shielded the state only and not municipalities); Leet v. Rider, 48 Cal. 623 (1874) (applying common law rule to conclude a street in Sacramento could not be taken by adverse possession).

[53] See Almy, 26 A. at 59-60 (listing cases and noting the division between states).

municipality could not be adversely possessed.[54]  Over time, this generated

discussion of a "rule" allowing adverse possession of government property held in

a "proprietary capacity."[55]  But scholars question the extent to which this "rule" is

actually established:

> In repeated dictum, the Washington State Supreme Court has said that it is possible to obtain title to lands owned by cities, counties, and other governmental entities below the state level in a "proprietary capacity."[56]  While the supreme court has not identified what is a proprietary capacity [for purposes of adverse possession], a decision of the Washington State Court of Appeals has.  It held that land owned by an irrigation district but not actually used for its ditches or works was "proprietary" and subject to adverse possession.[57]

We seek to avoid sinking into the governmental versus proprietary "'quagmire that

has long plagued the law of municipal corporations'" created by the "willy-nilly

labeling of municipal activities" through the "[m]indless [a]pplication of [l]abels." [58]

---

[54] Town of W. Seattle v. W. Seattle Land & Improvement Co., 38 Wash. 359, 363-64, 80 P. 549 (1905) (citing BYRON K. ELLIOTT & WILLIAM F. ELLIOTT, THE LAW OF ROADS AND STREETS § 883, at 968-69 (2nd ed. 1900); JOHN F. DILLON, COMMENTARIES ON THE LAW OF MUNICIPAL CORPORATIONS § 675, at 803-04 (4th ed. 1890); Ralston v. Town of Weston, 46 W. Va. 544, 33 S.E. 326 (1899)).

[55] See, e.g. Gustaveson, 83 Wash. at 305-06 (considering an issue of adverse possession by posing "the vital question here to be: Does the county hold land, acquired by purchase at tax sale for want of another purchaser, in a governmental capacity, as distinguished from a proprietary capacity?").

[56] (Citations omitted.)

[57] 17 STOEBUCK AND WEAVER, supra, § 8.8, at 516 (citing Kesinger v. Logan, 51 Wn. App. 914, 756 P.2d 752 (1988)).

[58] Hugh D. Spitzer, Realigning the Governmental/Proprietary Distinction in Municipal Law, 40 SEATTLE U.L. REV. 173, 202 (2016) (quoting Indian Towing Co. v. United States, 350 U.S. 61, 65, 76 S. Ct. 122, 100 L. Ed. 48 (1955)).

We do not need to label land uses as "proprietary" or "governmental" to decide whether RCW 7.28.090 shields municipal lands from claims of adverse possession. When the legislature enacted RCW 7.28.090, it chose to shield sovereign government entities—the United States and Washington state—as well as "lands held for any public purpose." And it mandated that RCW 7.28.090 "be liberally construed."[59] Unlike the common law rule of nullum tempus, this statutory immunity is not based upon sovereignty alone and does not merely stop the limitations period from running. The legislature went beyond the common law, barring the taking of "lands held for any public purpose" by adverse possession. It did not fashion the statute in terms of the troublesome "governmental" versus "proprietary" dividing line.

With this background in mind, we determine the plain meaning of "lands held for any public purpose" by looking to the statute's context, related provisions, and overall scheme.[60]

RCW 7.28.090 immunizes certain government-held property from adverse possession. The doctrine of adverse possession ensures the maximum utilization of land, encourages the rejection of stale claims, and promotes quiet titles.[61] The doctrine of governmental immunity against adverse possession also promotes stable ownership and land use because its absence "would encourage

---

[59] RCW 7.28.100.

[60] Cent. Puget Sound Reg'l Transit Auth., 191 Wn.2d at 234.

[61] Chaplin v. Sanders, 100 Wn.2d 853, 859-60, 676 P.2d 431 (1984).

16

encroachments . . . and hinder public use."[62]  Municipal governments hold land for the benefit of the public,[63] and immunizing certain municipal property against adverse possession eliminates the risk of permanent injury to the public from the careless civil servant who fails to monitor boundaries.[64]

In accordance with these goals, the statutory phrase "lands held for any public purpose" means land actually used or planned for use in a way that benefits the public as shown by the benefits flowing directly or indirectly from governmental ownership of the particular property.  To be shielded by the statute, the municipality must show some advancement of the public's wellbeing from any part of the property.  This is a fact-specific, reality-based inquiry that recognizes a single parcel owned by a government entity can serve multiple uses providing different public benefits, regardless of whether those uses are traditionally classified as "governmental" or "proprietary."[65]  We do not decide the outer bounds

---

[62] Kiely, 173 Wn.2d at 940.

[63] Id. at 937 (citing State ex rel. York v. Bd. of Comm'rs, 28 Wn.2d 891, 898, 184 P.2d 577 (1947)).

[64] Gorman, 175 Wn.2d at 73 (citing LAWS OF 1986, ch. 305, § 100; Bellevue Sch. Dist. No. 405 v. Brazier Constr. Co., 103 Wn.2d 111, 114, 691 P.2d 178 (1984)); see Thompson, 98 U.S. at 489 ("In a representative government, where the people do not and cannot act in a body, where their power is delegated to others, and must of necessity be exercised by them, if exercised at all, the reason for applying these [governmental immunity] principles is equally cogent.").  This risk is more than hypothetical here because, as amicus Washington State Association of Municipal Attorneys explains, public utility districts, which are municipal corporations, manage approximately 35,000 miles of electric distribution and transmission corridors in Washington.

[65] Indeed, counsel for the homeowners agree proprietary functions of government can provide public benefits.  Wash. Court of Appeals oral argument, Michel v. City of Seattle, No. 82073-7-I (Sept. 30, 2021), at 21 min., 10 sec. through

of what actual or planned uses could provide public benefits, but we note that abandoned or forgotten lands put to no actual or planned use at all do not provide public benefits.[66]

The homeowners argue land used for electrical distribution lines cannot, as a matter of law, be held for a public purpose.[67] They rely upon a case about municipal taxing authority, Okeson v. City of Seattle,[68] for support. In Okeson, the Supreme Court stated, "A city's electric utility serves a proprietary function of the government."[69] The City contends land used for electrical distribution lines is, as a matter of law, held for a public purpose. It relies upon a condemnation case, Central Puget Sound Regional Transit Authority v. WR-SRI 120th North LLC, for support.[70] There, the Supreme Court stated, "'The generation and distribution of electric power has long been recognized as a public use by this court.'"[71]

Neither standard is apt here. The power to tax is distinct from the power to condemn, and neither addresses government immunity from adverse possession.

---

21 min., 20 sec., https://www.tvw.org/watch/?clientID=9375922947&eventID=2021091164&startStreamAt=1260&stopStreamAt=1285&autoStartStream=true.

[66] See Sisson v. Koelle, 10 Wn. App. 746, 751, 520 P.2d 1380 (1974) (holding that land held by a county but "abandoned and forgotten" and "never devoted to any use, public or otherwise," could be adversely possessed).

[67] Merriam Resp't's Br. at 18-20; Michel Resp't's Br. at 37-41.

[68] 150 Wn.2d 540, 78 P.3d 1279 (2003).

[69] Id. at 550 (citing Tacoma v. Taxpayers of Tacoma, 108 Wn.2d 679, 694, 693, 743 P.2d 793 (1987)).

[70] 191 Wn.2d 223, 422 P.3d 891 (2018).

[71] Id. at 247 (quoting Carstens v. Pub. Util. Dist. No. 1 of Lincoln County, 8 Wn.2d 136, 143, 111 P.2d 582 (1941)).

Indeed, our Supreme Court recently explained that when applying the government immunity doctrine, courts should look to the context of the specific case and apply the rules relevant to the area of law under consideration.[72] Thus, we apply the standards set by the legislature in RCW 7.28.090 to determine whether tract 44 was held for a public purpose and shielded from adverse possession.

The undisputed record shows tract 44 has long been used for recreation. When the City took possession in 1951, it allowed temporary permits for adjacent property owners—including the Merriams' predecessors—to use tract 44 for gardening and additional yard space.[73] By 1954, a fish screen had been installed on tract 44 by the Washington Department of Game to maintain the trout stocked in Echo Lake for fishing.[74] At least as early as 1963, the City let sportsmen and "hundreds of children and teenagers" use tract 44 like a park to access Echo Lake for fishing and swimming.[75] A 1972 letter from the City to the Department of Game states its support for a "continuing program of maintaining a fishery in Echo Lake."[76] In 1973, the City and King County entered into a "permit agreement" providing for the creation of a public park along tract 44.[77] The agreement authorized "recreational purposes," including "picnicking, swimming, bicycling, and

---

[72] Lakehaven, 195 Wn.2d at 764-65.

[73] CP at 847.

[74] CP at 643.

[75] CP at 626-28.

[76] CP at 642.

[77] CP at 116.

such outdoor recreational activities as are appropriate for a neighborhood park."[78] And in 2001, the City signed a memorandum of understanding with King County and the city of Shoreline to dedicate a continuous area of tract 44 for use as part of the Interurban Trail.[79]

Tract 44 has also been used by the City to supply utility services to the public. Since it took possession in 1951, the City has used the property for electrical distribution lines.[80] In 1976, the City designated part of tract 44 to "construct, reconstruct and maintain" a water main.[81]

Lands are "held for any public purpose" under RCW 7.28.090 when their actual or planned uses directly or indirectly benefit or advance the public's wellbeing. The public has been benefitting from the City's uses of tract 44 since it took possession in 1951. The City has used its land to provide the public electricity and water. The City has used its property for public parkland and recreation, including swimming, fishing, picnicking, and bicycling. Because these uses have provided direct and indirect benefits to the public's wellbeing, the City

---

[78] CP at 116.

[79] CP at 921.

[80] See CP at 123-29 (deed purporting to convey tract 44 to the City, which included a transmission line right of way for an existing power line); CP at 921 (memorandum of understanding between Shoreline, King County, and the City to create the Interurban Trail, noting the "primary purpose of [tract 44] is for the transmission and distribution of electricity).

[81] CP at 706-08.

held tract 44 for a "public purpose" under RCW 7.28.090.[82]  RCW 7.28.090 applies.

Therefore, we conclude the City is the owner of tract 44 in its entirety and that RCW 7.28.090 barred the homeowners from taking any of it by adverse possession.[83]  We vacate the trial court's order and remand for further proceedings in accordance with this opinion.

_____

WE CONCUR:

_____        _____

---

[82] Because this standard is more protective of government property than the common law rule, property shielded by the common law would be shielded by RCW 7.28.090 as well.

[83] The homeowners request attorney fees from this appeal under RAP 18.1 and RCW 7.28.083(3).  Because they do not prevail, we deny their request.