BENJAMIN WHEELER *vs.* ANSON J. STONE & others.

A disseizin of flats may be made by an appropriate occupation thereof for that purpose, as by entering upon and filling them up, or by building a wharf and using the flats adjoining for laying vessels at the same; in which cases, the occupation of the land, or the use of the flats, if exclusive, constitutes a disseizin of the proprietor: But passing with vessels over flats, and anchoring on them, or using them for the purpose of access to and egress from a wharf with vessels, being a usage of common right provided for in the ordinance of 1641, is not inconsistent with the right of the proprietor to a fee in such flats, and constitutes neither a disseizin nor a trespass.

Where it appeared that the tenant in a real action, who had acquired a title to a wharf by disseizin, had also exclusively occupied the flats at the end of the same, to the distance of eighty feet, for the purpose of laying vessels at such end. and had used the flats in front of the wharf, beyond the distance of eighty feet, for the purpose of access to and egress from the wharf with vessels, it was held, that the exclusive occupation to the distance of eighty feet was a disseizin of so much, but that the occupation beyond that distance was not a disseizin of the residue, and that the former did not extend to and create a disseizin of the latter.

THIS was a real action brought to recover a certain wharf and flats in the harbor of Boston, as incident to the upland estate of the demandant.

At the November term, 1841, after the cause had been opened to the jury, it was ordered, on the agreement of the parties, that it be submitted to William D. Sohier, William Minot and Benjamin Rand, Esquires, to hear the parties, and to report a statement of the title of each of them, and the facts relating thereto, in the same manner as if found by a jury, together with all facts, which the auditors, or either party, might deem material to be considered; and that upon such report, and such inferences as the court might draw therefrom, not inconsistent with the finding of the auditors, *the court should determine the course of the lines over the* flats, and direct a verdict to be taken and judgment entered thereon for either party, as they should think proper.

In pursuance of this order, the auditors proceeded with the business referred to them, and on the 22d of March, 1843, made their report thereon.

The cause was argued upon the report, (the facts of which, so far as they are material to an understanding of the opinion of the court, are therein stated,) at the March term, 1844, by *C. P. & B. R. Curtis,* for the demandant, and by *W. C. Aylwin & C. G. Loring,* for the tenants.

The opinion of the court was delivered, at the March term, 1845, by

HUBBARD, J.   The facts found by the auditors, which are important in coming to a decision of the case, are the following :

1. That the tenants and their predecessors have had actual and exclusive possession of the Stone Wharf, and the land under the same, more than sixty years previous to the 1st of August, 1832; that the said wharf has existed for the whole of that period of nearly its present dimensions; and that the whole of the wharf has existed as it now is, for more than forty years previous to the said 1st of August, 1832.

2. That the owners and tenants of the wharf occupied the

flats at the southerly end of the wharf exclusively, from the time of its erection, to the extent of eighty feet southerly, for the purpose of laying vessels alongside that end of the wharf; and that they used the flats in front of the wharf, beyond the extent of eighty feet, for the purpose of access to and egress from the wharf with vessels.

The demandant claims the flats appurtenant to five distinct lots, the record history of which is traced, in whole or in part, to the first possessions of the inhabitants of Boston. The tenants also claim a wharf and the flats appurtenant, as held by their ancestor under different conveyances, which are also traced to the first possessions. But it is observable, that though the estates are contiguous, neither party traces title to any portion of the premises, from a common ancestor, or from the same owner; and as each estate was wharf property, with the flats appurtenant, there should be no interference of their respective lines, on a proper division of the flats, unless one of the parties has gained a title by disseizin; and, in fact, the tenants, while they allege that they have a good right to the demanded premises, by force of their conveyances, also aver that they have obtained a title to them by disseizin.

Before discussing other points which have arisen in the case, we propose to consider, first, the tenants' claim to the demanded premises by disseizin.

A person may be disseized of flats, as well as of any other lands, and that by an occupation according to the nature of the property. The continual passing over them in vessels and small craft, and anchoring on them, constitutes neither a disseizin nor a trespass; such use in third persons being consistent with the nature of the grant. But if a stranger enters upon flats and fills them up, and continues in possession of the lands thus made, he will, by lapse of time, acquire a perfect title to the soil, and so by building a wharf and using the flats adjoining by laying vessels at it, and doing this exclusively, such a possession will constitute a disseizin of the true owner, and by lapse of time will, if not disturbed, ripen into a perfect title. This is settled in the leading case of *Rust* v. *Boston Mill Corporation*, 6 Pick. 158.

The learned auditors are well acquainted with the nature of the property, with the use to which it is applied, and with the legal import of the words used by them; and we therefore apply their language according to its legal acceptation, and understand them to find, as a fact, an exclusive seizin and possession of the wharf and the flats in front of it, to the extent of eighty feet, without undertaking to ascertain whether the course of the lines would be the same, when they should be traced by the title deeds.

With the view of the law as above stated, and upon the fact as found by the auditors, we are of opinion, that the eighty feet of flats lying at the southerly end of the tenants' wharf, and that portion of the wharf itself demanded in the writ, as the same is designated on the plan accompanying the report, is well established in the tenants, and the title is not qualified by their use of the words, "for the purpose of laying vessels at and alongside that end of the wharf," such continued use constituting a disseizin; and, consequently, if the predecessors of the demandant ever had the right to the flats, composing the eighty feet in length and of the breadth of the wharf, or any part of them, the title to the same is now lost by disseizin, the tenants not claiming under them.

As to that part of the flats lying in front of the eighty feet, to which the demandant claims title, the auditors find, that "the owners and tenants used the flats in front of the wharf beyond the extent of eighty feet, for the purpose of access to and egress from the wharf with vessels;" and, in respect to these flats, the counsel for the tenants argue, that the predecessors of the demandant have been disseized of them, as they have been of the eighty feet itself; that the entry into and exclusive possession of one part will extend to and create a title to the whole flats; and also that they have in fact appropriated them to their own use, because, as they contend, the demandant's predecessors having been excluded from all beneficial use of them, he therefore is deprived of the right of getting on to them.

But we cannot give our assent to this reasoning, nor do we think the position supported by any facts proved in the case; the finding of the auditors reaches no further than that the tenants of the wharf used those flats for the purpose of access to and egress from the wharf with vessels; but such use, being provided for in the ordinance itself, by which the flats were originally granted to private individuals, is entirely consistent with the right of the demandant and his predecessors to the fee in the flats, and works no disseizin of the true owner. By such passing over the flats in front, no actual possession was gained, nor any title acquired by disseizin; for titles resting in disseizin are not to be extended by construction.

Nor, in point of fact, were the owners of the defendants' wharves deprived of access to them, (the lower portion of the flats,) because the flats to the south and west were not filled up, and by going over these flats such owners could reach the wharves without trespassing on the tenants; and the amount of benefit arising from such use, even if it were merely nominal to the demandant's predecessors, is unimportant to be considered in a question of title, where the issues and profits are not in question. If, then, the course of the demandant's lines will convey him over the eighty feet in possession of the tenants, his title to the flats lying to the south and east will not be impaired by any disseizin of such eighty feet committed by the owners of the tenants' wharf.

It was argued, that, the previous owner of the wharf above having been disseized of a part below, the portion still nearer to the channel did not pass by a constructive seizin, the intervening part being cut off. But this position, though ingeniously taken, we think unsound. The rightful owners not having been disseized of the part nearest to the channel, they could convey the same; and, using apt words for that purpose, their whole property in the flats would pass according to their intention; and the construction of the deeds, if needful, would be in favor of the grantees, where the intention is declared. Where the words of a deed are such as to convey in terms a larger tract than the grantor owns, all that

27\*

he does own, which is contained within the terms of the description, will pass.

Again, it has been argued, that if mere possession is laid out of the question, the right of these parties may depend on who has the older title; but the titles of the original proprietors originated so nearly at the same time, that we think no stress can be laid upon this argument.

The tenants' counsel assert, that they trace their title to Thomas Joy, who had leave to buy a piece of ground in February, 1636, and to whom, on December 26th, 1642, liberty is granted to set up a house by the water side; but whether this was the same piece of ground, which he had liberty to buy, does not appear; and the subsequent conveyances show that he owned more than one house. Nor does he appear to have had liberty granted him to wharf out. But Thomas Clarke, under whom also the tenants claim, had leave to wharf on the 27th of the 9th month, 1643 (November 27th, 1643).

The demandants, on the other hand, assert that they trace their title to Isaac Cullamore, who bounded on the cove southeast. The date of his possession is not given, but he was bounded by Bart. Passmore on the south-west, and Passmore sold to Sweet, on the 2d of the 10th month, 1641 (December 2d, 1641), so that his possession was prior to that time, and, for all that appears, as early as that of Joy; and we find that Cullamore had leave to wharf on the 29th of the 11th month, 1643 (January 11th, 1643), only two months after the date of the like permission to Clarke, and from the description of Upshall's estate, from whom the demandant's title is regularly traced, it is evident he bought of Cullamore, and Upshall also had like liberty to wharf on the 29th of the 5th month, 1644 (July 29th, 1644).

A learned and interesting account has been given us by the senior counsel for the tenants, as to the origin of titles in the colony, and the early settlement and incorporation of the town; and he contends that the title to the ungranted lands in the town, and to the flats, passed from the government to

the town of Boston, by the act of incorporation; that after the ordinance of 1641, the acts of the abutters recognize the existence of the rights of the town in the flats, and that the town controlled the use of the flats and granted liberty to wharf out to low water mark; and that this is shown conclusively by the doings of the town in 1673, when the barricado titles were created;* and that the parties, at the time of the demandant's action, were in under the grantees from the town of the barricado titles; and the conclusion he draws is, that the demandants cannot extend their claim beyond the circular line, and consequently can have no right to the demanded premises.

But, in answer to this, the auditors, in their thirteenth answer to the tenants' points, say, "they have no evidence that the circular line has been recognized by the parties or their predecessors for any practical purpose," and they also say, "they are unable to define the course of the circular line as bearing on the matters in difference between the parties."

But, it is not to be overlooked, that if the demandants claim from grantees under the barricado title, the same is true in respect to the tenants, and the consequence is, that there is but an estoppel against an estoppel, which sets the matter at large. 1 Rol. Abr. 874, l. 50; 4 Com. Dig. Estop., E. 9.

It has been contended, by the counsel for the demandant, that the town had no right or authority to fix the circular line, as a boundary beyond which the wharves should not be extended, and that the town as such had no title to the flats, and a case of *Foster* v. *The City of Boston* has been cited, which was tried, it is said, before chief justice Parker, in which the city relied in their defence upon the barricado title, and the circular line, but that the chief justice disregarded them, and judgment was given against the city. But the facts, in regard to the case, are so concisely mentioned, and the manner in which the questions arose and were decided, so imperfectly stated, that we cannot place great reliance on that decision.

---

* The origin of the barricado title is explained by PUTNAM, J., 5 Pick. 135.

Nor are we disposed, on due consideration, by any thing we may say in this case, to disparage the barricado title, so called, believing that many estates are held under it, or in conformity with it; and we put the decision of this case, so far as that question is concerned, on the finding of the auditors, that neither the parties nor their predecessors recognized it for any practical purpose.

---

An order was then made in the cause, with the consent of the parties, appointing George R. Baldwin a surveyor to measure the cove between the north and south battery (within which were the flats in question); to ascertain and lay down the lines of high water and low water, as they existed at the time of the original grants to the predecessors of the respective parties, as near as the same could then be ascertained; and to lay down the line of low water from one battery to the other, and thereon to mark the lines of the respective estates, so far as the same were necessary to ascertain the lines on the flats of the estates claimed by the parties. The surveyor was also required to direct the running of such lines, as the parties, or either of them, might think necessary to enable them to present their views of the case, on the return of the survey and report.

The surveyor, having proceeded under the commission, and completed his survey, made an elaborate report thereon, accompanied by two plans, on the 28th of March, 1846. One of the plans contained a delineation of the survey specified in the commission. The other was drawn with a view to illustrate the operation of the rule heretofore established, and of several new ones suggested by the surveyor, for the division of flats among the conterminous proprietors of the upland estates adjoining, in their application, respectively, to the premises in question.

The cause was argued upon the surveyor's report, at the present term, and the opinion of the court was delivered by

SHAW, C. J. Several years have elapsed since this case was

commenced, and it has been many times before the court, in various forms.   The object was to try the title to a parcel of flats in Boston harbor, formerly of little value, but which, by the progress of improvement, and the enhanced value of land adapted to maritime and commercial purposes, have come to be of great importance.   The facts were exceedingly complicated, and intricate, involving inquiries which extended back more than two hundred years to the earliest settlement of the town.   The case, upon the facts, was settled by intelligent commissioners agreed upon by the parties; and many important questions have been argued and heretofore decided by the court, the opinion having been given by our late lamented associate, Mr. Justice Hubbard.

The question was as to the relative rights of the parties to certain portions of flats, as incident or belonging to their respective estates, as owners of land bounding upon salt water. I avoid the term "appurtenant" to their upland, because it might mislead, as land cannot be held as appurtenant to land. It is a right to the fee of the soil, over which the tide ebbs and flows, to which the riparian proprietor has title to low water mark, as such owner, by force of the Massachusetts colony ordinance of 1641, subject to a public easement, for all persons to pass and repass over it with boats and vessels, when covered with water.   It is a title of a peculiar character, depending on a principle of law, which seems very simple, as it stands in the quaint language of the old colony ordinance; but it is found to be exceedingly difficult of practical application, in consequence of the vast variety of localities to which it is necessary to apply it.   This uncertainty is increased by the difficulty of ascertaining, after a place has been long settled, what were the original and natural lines of high water and low water, and to what extent currents have changed, and the yielding alluvial soil has been formed or washed away by them.

The principles of law, upon which the demandant's title rested, were formerly discussed and decided by this court, as far as they could be, with the knowledge of the facts then

furnished. It appeared, that a considerable part of the flats belonging originally to the demandant's estate, and to which, had there been no alienation or disseizin, he would have been entitled, had been enclosed and built upon, by wharves or other solid structures, by the tenants or those under whom they claim, or had been exclusively occupied by vessels lying at such wharves, and that such occupation had continued over forty years, and a large part over sixty years. In consequence of this disseizin and lapse of time, whatever might have been the original title of the demandant or his predecessors, as such proprietors of upland, he had lost his remedy to recover them when this action was brought.

But beside and beyond the flats thus occupied by any wharf, or by a permanent and exclusive use for the dockage of vessels, were portions of land over which the tide still ebbed and flowed, and which might or might not belong to the demandant's upland, according as it should be settled, what were the lines of the flats so belonging to his estate. Entering on such land, passing over it with boats and vessels ever so frequently, could amount to no claim of title, or be proof of occupancy, because it was a common right. To be exclusive, it must either be built upon, enclosed, or used exclusively for some permanent purpose, as docking vessels secured to a wharf. In the present case, there had been no union of title or common occupancy of the two estates, no disseizin, no estoppel, no permanent, exclusive possession, nothing to vary or change the rights, which each proprietor originally had to low water mark, in virtue of the colony ordinance, as riparian proprietor. It became necessary, then, to ascertain, whether any of the flats, thus still open and unenclosed, originally belonged to the demandant's estate, or in other words, whether, if a division were now made of the flats, according to the true principles of the colony ordinance, as it has been expounded and applied by judicial decisions, any of the flats thus open and unenclosed, and in controversy between these parties, would have belonged to the estate of the demandant, as riparian proprietor. Under ordinary cir-

cumstances, it would not have been difficult to decide this question. But it was otherwise here. The adjacent proprietors, on both sides, in ignorance probably of the true lines, had assumed different modes in running their lines, and had run them in various directions, so that lines of conterminous proprietors could not be safely trusted as guides. Add to this, that some of the flats and low grounds had been raised and built upon, so that it became difficult to ascertain the original direction of the shore of the cove, or the lines of low water and high water. Under these circumstances, a skilful surveyor was appointed, by consent of parties, to make a survey of the entire cove, to lay down, according to the best evidence now to be obtained, the ancient lines of high and low water, and the course of the shore, and all other local facts, tending to show what were the flats, which, according to the ordinance and the rules laid down on that subject in the case of *Rust* v. *Boston Mill Corporation*, 6 Pick. 158, and other cases, belonged to the upland estate of the demandant. This has now been done. Upon examination of the report and plans of the surveyor, Mr. Baldwin, the court are satisfied that no part of the open and unenclosed flats demanded in this suit would, upon such original division of the flats, properly belong to the demandant's upland estate, and therefore that judgment must be entered for the tenants.