68

[No. 85962-1.   En Banc.]
Argued February 14, 2012.     Decided August 16, 2012.

JAMES GORMAN IV, *as General Partner, Respondent*, v. THE
CITY OF WOODINVILLE, *Petitioner*.

*Greg A. Rubstello*, for petitioner.

*Catherine C. Clark* (of *The Law Office of Catherine C. Clark PLLC*), for respondent.

¶1   J.M. JOHNSON, J. — Washington law is clear that "title by adverse possession cannot be acquired against the state." *Commercial Waterway Dist. No. 1 of King County v. Permanente Cement Co.*, 61 Wn.2d 509, 512, 379 P.2d 178 (1963). One reason is the statute of limitations for establishing a claim of title through adverse possession cannot run against the government. RCW 4.16.160 provides, "[N]o claim of right predicated upon the lapse of time shall ever be asserted against the state." We are asked whether RCW 4.16.160 bars a quiet title action where the claimant alleges he adversely possessed property belonging to a private individual *before* a municipality acquired record title to the land. We hold it does not. We therefore affirm the Court of Appeals and remand for trial to determine the validity of James Gorman's claim of title.

FACTS AND PROCEDURAL HISTORY

¶2   James Gorman IV, as general partner of Hollywood Vineyards Limited Partnership, claims title to certain real

property through adverse possession. The property at issue, Tract Y, was dedicated to the city of Woodinville (City) by a private owner in December 2005 for a roadway improvement project. Gorman owns property adjacent to Tract Y. On July 10, 2007, Gorman filed an action to quiet title claiming he acquired Tract Y through a 10-year period of adverse possession that transpired while the land was still in private hands.

¶3 The City moved to dismiss under CR 12(b)(6), arguing Gorman's claim is prohibited by RCW 4.16.160.[1] The trial court granted the City's motion and dismissed Gorman's claim. The Court of Appeals reversed. It held Gorman's claim is not barred because it is alleged the statute of limitations ran while the subject land was privately owned. *Gorman v. City of Woodinville*, 160 Wn. App. 759, 765, 249 P.3d 1040 (2011). The Court of Appeals remanded for trial to determine the validity of Gorman's claim of title. *Id.*

STANDARD OF REVIEW

¶4 Dismissal of a claim under CR 12(b)(6) is reviewed de novo. *Reid v. Pierce County*, 136 Wn.2d 195, 200-01, 961 P.2d 333 (1998). Dismissal is appropriate only if the complaint alleges no facts that would justify recovery. *Id.* The plaintiff's allegations are presumed to be true, and all reasonable inferences are drawn in the plaintiff's favor. *Id.* at 201.

ANALYSIS

¶5 The doctrine of adverse possession permits a party to acquire legal title to another's land by possessing the property for at least 10 years in a manner that is "(1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile." *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d

---

[1] The City is a Washington municipal corporation. Municipalities acting in a governmental capacity are considered "the state" for purposes of RCW 4.16.160. *See Permanente Cement Co.*, 61 Wn.2d at 512.

754, 757, 774 P.2d 6 (1989) (citing *Chaplin v. Sanders*, 100 Wn.2d 853, 857, 676 P.2d 431 (1984)). Title vests automatically in the adverse possessor if all the elements are fulfilled throughout the statutory period. *El Cerrito, Inc. v. Ryndak*, 60 Wn.2d 847, 855, 376 P.2d 528 (1962) ("When real property has been held by adverse possession for 10 years, such possession ripens into an original title.").

■ ¶6 State-owned land is statutorily protected from claims of adverse possession. Under RCW 4.16.160, the statute of limitations for adverse possession will not run against the State or city acting in its governmental capacity. *Town of West Seattle v. W. Seattle Land & Improvement Co.*, 38 Wash. 359, 80 P. 549 (1905). Whether the government is subject to a previously perfected claim of adverse possession when it acquires property from a private party is an issue of first impression.

■ ¶7 The City argues RCW 4.16.160 bars a plaintiff from ever asserting a claim of title acquired through adverse possession against a governmental entity because such claims are "predicated upon the lapse of time." But, RCW 4.16.160 cannot shield the City under the facts presented here. First of all, RCW 4.16.160 did not prevent the statute of limitations from running against the prior private owner before the land was dedicated to the City. This grantor could convey to the City whatever interest he had only at the time of the dedication. If the dedicator's title had been extinguished by adverse possession prior to the dedication, he had nothing to convey.

■ ¶8 The City points to the fact it is the only named defendant in Gorman's suit to demonstrate this is the type of action barred by RCW 4.16.160. The City claims this undermines the Court of Appeals' conclusion that "the underlying claim here involved only private parties." *Gorman*, 160 Wn. App. at 763. Yet, the City is the proper defendant as the current record title holder of Tract Y. There was no reason for Gorman to join the private landowner who allegedly lost his property to Gorman through

adverse possession and purported to transfer whatever interest he had left to the City.

¶9 Moreover, Gorman is not asserting a claim "predicated upon the lapse of time"—the type of claim barred by RCW 4.16.160—as against the City. Rather, Gorman claims the requisite period of time *already ran* against the private owner. Gorman's claim against the City is that he holds vested title to the disputed property. Title to the property vested in Gorman's favor if, as the complaint asserts, he fulfilled all the requirements of adverse possession for at least 10 years before it was dedicated to the City. *Bowden-Gazzam Co. v. Hogan*, 22 Wn.2d 27, 39, 154 P.2d 285 (1944) (quoting *Wheeler v. Stone*, 55 Mass. (1 Cush.) 313, 1848 WL 4244, 1848 Mass. LEXIS 42).

¶10 Title acquired through adverse possession cannot be divested by acts other than those required to transfer a title acquired by deed. This rule was articulated in *Mugaas v. Smith*, 33 Wn.2d 429, 206 P.2d 332 (1949). Ms. Mugaas claimed she acquired title to certain real property through adverse possession. The Smiths countered that Ms. Mugaas lost her claim to the disputed property by ceasing to use the property after the period of adverse possession had transpired. This court disagreed and quieted title in Ms. Mugaas. We held a title obtained through adverse possession is as strong as a title acquired by deed: " 'it cannot be divested . . . by any other act short of what would be required in a case where . . . title was by deed.' " *Id.* at 431 (quoting *Towles v. Hamilton*, 94 Neb. 588, 591, 143 N.W. 935 (1913)). Therefore, if Gorman obtained title to Tract Y through adverse possession, his title was not extinguished through the previous owner's attempt to dedicate the land to the City.

¶11 RCW 4.16.160 was enacted to protect the public from losing property due to the carelessness of civil servants and to shield the government from costly litigation. *See* Laws of 1986, ch. 305, § 100; *Bellevue Sch. Dist. No. 405 v. Brazier Constr. Co.*, 103 Wn.2d 111, 114, 691 P.2d 178 (1984) (quoting *United States v. Thompson*, 98 U.S. (8 Otto)

486, 489-90, 25 L. Ed. 194 (1878)). The City claims these policies require dismissal of Gorman's suit. But, the policies underlying RCW 4.16.160 are not offended when privately held property is acquired by adverse possession. In these circumstances, title is not lost as a result of the government's failure to monitor its property. Allowing suits like Gorman's will not result in the loss of property properly acquired by the State. Furthermore, the City could have avoided the cost of this litigation by conducting an inspection or survey of the dedicated property to ensure no superior claim to it existed. ·

¶12 The City also argues that Gorman's claim is barred because he failed to bring a quiet title action prior to the City's acquisition of the property. Yet, "[t]he law is clear that title is acquired by adverse possession upon passage of the 10-year period." *Halverson v. City of Bellevue*, 41 Wn. App. 457, 460, 704 P.2d 1232 (1985). The new title holder need not sue to perfect his interest: "[t]he quiet title action merely confirm[s] that title to the land ha[s] passed to [the adverse possessor]." *Id.*; *see also Ryndak*, 60 Wn.2d at 855. A quiet title action was not a prerequisite to Gorman's claim against the City. It simply would have clarified what already exists.

CONCLUSION

¶13 Under the City's interpretation of RCW 4.16.160, anyone who lost his or her interest in property to an adverse possessor could extinguish the adverse possessor's vested title by transferring record title to the government. We presume the legislature did not intend such absurd consequences. RCW 4.16.160 does not render title acquired through adverse possession meaningless by operating to revive the prior owner's estate. If a claimant satisfies the requirements of adverse possession while land is privately owned, the adverse possessor is automatically vested with title to the subject property. The prior owner cannot extin-

guish this title by transferring record title to the government. We therefore affirm the Court of Appeals and remand for trial to determine the validity of Gorman's claim of title.

C. JOHNSON, OWENS, FAIRHURST, STEPHENS, and WIGGINS, JJ., concur.

¶14 MADSEN, C.J. (concurring) — The property at issue was dedicated to the city of Woodinville by a private owner in December 2005. The city had identified the property as a necessary part of a first priority project on its capital improvement plan. The project centers around improving a busy intersection and is intended to alleviate high vehicle congestion and address safety concerns. James Gorman claims he adversely possessed the property sometime prior to the 2005 dedication.[2] However, he evidently did nothing to assert his right to the property until this quiet title action in July 2007. Given that the city had no notice of Gorman's claim, it was moving forward with its project and had undoubtedly made a substantial investment when Gorman sought to quiet title. This litigation has injected uncertainty and delay into this public project. It is now unclear when, and if, it will be able to address the problems caused by the unsafe intersection.

¶15 As the facts of this case demonstrate, it is time to rethink the doctrine of adverse possession. Many of the beneficial purposes the doctrine is said to serve do not justify the doctrine in modern times. Moreover, the doctrine's basic premise is legalization of wrongful acquisition of land by "theft," conduct that in our time we should discourage, notwithstanding the possibility of putting land to a higher or better use. The doctrine also creates uncertainty of ownership, lying as it does outside documents in writing and the recording statutes. I encourage the legislature to seriously consider phasing the doctrine out, at least

---

[2] Gorman claims to have used the property for purposes of vehicle parking.

where the adverse possessor has no colorable title or good faith belief in ownership of the land.

¶16 The adverse possession doctrine allows a person to acquire the property of another through wrongful possession. It was "formulated at law for the purpose of, among others, assuring maximum utilization of land, encouraging the rejection of stale claims and, most importantly, quieting titles." *Chaplin v. Sanders*, 100 Wn.2d 853, 859-60, 676 P.2d 431 (1984) (citing 7 Richard R. Powell, Real Property ¶ 1012[3] (1982); Charles C. Callahan, Adverse Possession 91-94 (1961)). The primary underlying philosophy is that land use is favored over disuse. *Finley v. Yuba County Water Dist.*, 99 Cal. App. 3d 691, 696, 160 Cal. Rptr. 423 (1979); *Warsaw v. Chi. Metallic Ceilings, Inc.*, 35 Cal. 3d 564, 575, 676 P.2d 584 (1981).

¶17 In this state the doctrine of adverse possession is primarily covered by three statutes of limitation: RCW 4.16.020, RCW 7.28.070, and RCW 7.28.050. In 1892, the first of these statutes was identified as an adverse possession statute. *Balch v. Smith*, 4 Wash. 497, 30 P. 648 (1892); *see* 17 William B. Stoebuck & John H. Weaver, Washington Practice: Real Estate: Property Law § 8.2, at 506-07 (2004). Thus, as it has developed in our state, the doctrine is not entirely a creature of the common law, although that is where its origins lie.

¶18 The doctrine was originally intended to protect both individuals who knew they were appropriating another person's land and individuals who believed the land belonged to them. *Chaplin*, 100 Wn.2d at 860 (citing 7 Powell, *supra*, at ¶ 1013[2]; Callahan, *supra*, at 49-50; 3 Am. Jur. 2d *Advancements* § 104 (1962)). But in either case, "adverse possession is an offense against possession, against the legal right of the person entitled to possession." 17 Stoebuck & Weaver, *supra*, § 8.6, at 512. The doctrine has thus been compared to rewarding theft of land. *See, e.g., Miller v. Anderson*, 91 Wn. App. 822, 827, 964 P.2d 365 (1998) ("courts will not permit 'theft' of property by adverse possession

unless the owner had notice and an opportunity to assert his or her right"); 17 STOEBUCK & WEAVER, *supra*, § 8.1, at 503-04 (since adverse possession permits acquisition of legal title through wrongful acts, the popular notion is that adverse possession amounts to "legalized thievery").

¶19 Modern commentators have concluded that adverse possession is out of place in America's free market economy. "A good work ethic forms the American foundation and a person gaining title via adverse possession or the use of another's land without paying for it rewards the wrongdoer and is contrary to the American way of life." William G. Ackerman & Shane T. Johnson, *Outlaws of the Past: A Western Perspective on Prescription and Adverse Possession*, 31 LAND & WATER L. REV. 79, 94 (1996) (footnotes omitted). More specifically, some of the purposes once served by adverse possession are not goals that our society, generally speaking, now seeks to pursue.

¶20 In the past, for example, the doctrine served the purpose of land utilization. But although putting land to productive use may have been desirable in the past, "there is little justification today for legal rules that force the use of land." Jeffrey Evans Stake, *The Uneasy Case for Adverse Possession*, 89 GEO. L.J. 2419, 2435 (2001). In modern times we have prohibitions on development of land needed for habitat for protected species, historic designations, and conservation lands, and the government actually pays people not to use their land to plant crops. Thus, less or nonproductive land uses can be desirable, and leaving land idle for a time may itself serve the beneficial purpose of holding land until its best use becomes clear. *Id.* at 2435-36; *see also Ackerman*, *supra*, at 96 (the "policy of maximum or increased use of the land supporting adverse possession[ ] is [also] in direct opposition to conservation" and we no longer need "[i]ncentives to render an increased use of land to open frontiers and provide for society" (footnotes omitted)).

¶21 In addition, despite our conclusion in *Chaplin*, there is room to doubt whether the doctrine's role in quieting title

is as much a positive aspect of the doctrine as we stated. While adverse possession "was, undoubtedly, of great importance in quieting titles in the past, . . . it is a dull tool that generates uncertainties of its own." *Stake, supra,* at 2448.

> [The] time-honored rationale offered for statutes of limitation is that they quiet titles. In other words, the adverse possession doctrine makes ownership more settled or certain. Quieted titles are good because they facilitate market transfers, reduce disincentives to investment, make it easier to obtain credit, and help owners feel more secure. The importance of this security is demonstrated by the high popularity of title insurance. It is also implied by the passage of marketable title acts, which quiet titles by quashing old claims inconsistent with the recent record. While these two modern developments underscore the need for certainty, they also show that the doctrine of adverse possession never did quiet titles completely, and they raise the question of whether adverse possession is still needed.

*Id.* at 2441-42 (footnotes omitted). Thus, rather than the "dull tool" of adverse possession, better tools are available, including "[t]itle insurance, marketable title acts, occupying claimant statutes, and low-cost methods of survey," and these could make statutes of limitation superfluous, "especially if the elimination of adverse possession would lead to even more careful recording of transactions." *Id.* at 2448-49.

¶22 In short, as the California court noted in *Finley*, there is a serious question about the viability of the adverse possession doctrine in connection with "modern ideals in a sophisticated, congested, peaceful society." 99 Cal. App. 3d at 697. Contrary to positive aspects of the adverse possession doctrine that held sway in the past, the present is better described colorfully, but seriously, as follows:

> Years ago when the Cowboy roamed the West, land barons purchased large tracts of land consisting of hundreds of thousands of acres. In part, to prevent stagnation of the land and under-use of natural resources, American courts imported two English doctrines—prescription and adverse possession. The

courts believed these two legal devices would provide an incentive to landowners to work all portions of their holdings.

Although these tools remain in effect today, the public policy supporting their usage has long since gone the way of the cattle drive and the chuckwagon. . . . [C]urrent public policy prefers land and resource preservation versus exploitation. In the past half-century, many groups have been founded to preserve land and natural resources through land trusts and other devices.

Not only are prescriptive easements and adverse possession relics of the past, they represent a significant imposition on landowner rights. . . . Landowners now comprise a much higher percentage of society than anytime in the last century in America. Private property ownership represents one of the few bastions of privacy left to American citizens, and thus, landowner rights have become much more important in recent years.

*Ackerman, supra,* at 79-80 (footnotes omitted).

¶23 Negative aspects of the doctrine recognized in the past continue to persist. Some of these are identified in the related area of the prescriptive easements doctrine. The prescriptive easements doctrine, like the adverse possession doctrine, "discourages neighborly conduct and accommodation. Landowners are required either to formalize permissive arrangements, or to prevent use by others to avoid the risk that rights will be established by prescription." RESTATEMENT (THIRD) OF PROPERTY: SERVITUDE § 2.17 cmt. c (2000). In addition, the prescriptive easements doctrine "tends to increase the costs of land ownership by creating a need for periodic monitoring to detect adverse uses." *Id.*

¶24 Also, as mentioned, recording statutes generally make a better tool for stabilizing land titles and uses, *see Ackerman, supra,* at 97, and there is certainly a serious disadvantage to the adverse possession doctrine because it "erode[s] the effectiveness and useful utility of both recording and marketable title statutes by creating uncertainty." *Id.* (emphasis omitted). Moreover, "[c]ompared with the rules of title transfer, which determine record title primar-

ily from documents that remain reliable for many years, the elements of adverse possession are indeterminate. . . . The doctrine raises factual issues calling for evidence of behavior that was not necessarily recorded or witnessed." *Stake, supra,* at 2439. Using an "extreme hypothetical" shows the potential for assuring that purchase of land will be made by the person who values the land most: "it would be difficult for the highest user to obtain land if no one knew who owned it." *Id.* at 2442. In fact, it is completely possible for the record title holder to *not* be the legal title holder.

¶25 In addition, acquisition of land by way of adverse possession completely bypasses the statute of frauds. The formalities generally required to prove and transfer land ownership do not exist when a person acquires legal title through adverse possession. Thus, the doctrine can create significant difficulty in land transactions, and it undisputedly adds to costs for title insurance.

¶26 The case now before us demonstrates the problem that the doctrine can create in regard to land transfers. Since there is no requirement that an adverse possessor record the title that vests through adverse possession, a subsequent purported transfer by the record title holder will be ineffectual if the claimant in this case prevails on remand in the quiet title action. Indeed, efforts to improve the safety of an intersection may be halted after what appeared to be a proper transfer of the disputed property from a private party to the city.

¶27 For all of these reasons, it is time to pursue the question posed by a commentator nearly three decades ago: " '[W]hy . . . are [we] ever justified in shifting the entitlement from the [true owner] to the [adverse possessor] after the passage of a number of years[?]' " *Id.* at 2421 n.9 (third and fourth alterations in original) (quoting Thomas W. Merrill, *Property Rules, Liability Rules, and Adverse Possession,* 79 Nw. U.L. Rev. 1122, 1127 (1984)).

¶28 The adverse possession doctrine has been reined in by some other jurisdictions. For example, the Alaska Legis-

lature recently amended its statutes with the result that Alaskans are limited to making adverse possession claims where the claimant either had color of title or had the mistaken but good faith belief that he owned the land. ALASKA STAT. § 09.45.052(a); ALASKA STAT. § 09.10.030; *see* Jennie Morawetz, *No Room for Squatters: Alaska's Adverse Possession Law*, 28 ALASKA L. REV. 341 (2011).[3] New Mexico's and Oregon's statutes are similar. N.M. STAT. ANN. § 37-1-22 (good faith requirement); OR. REV. STAT. § 105.620(1)(b) ("honest belief" of actual ownership).[4]

¶29 A stricter approach was adopted in Minnesota. Its law provides that "[n]o title to registered land in derogation of that of the registered owner shall be acquired by prescription or by adverse possession, but the common law doctrine of practical location of boundaries applies to registered land whenever registered." MINN. STAT. ANN. § 508.02. Thus, once a title is registered, it is impossible to acquire title to the registered land by adverse possession. *Konantz v. Stein*, 283 Minn. 33, 36, 167 N.W.2d 1 (1969). Record title holders in Minnesota may rest assured that their land cannot be taken from them by way of adverse possession.

¶30 I believe that the doctrine of adverse possession no longer serves purposes in this state that justify recognizing title acquired through wrongful possession. Insofar as the doctrine serves the goal of utilization of land, we are now at a point where preserving unused land is not considered to be a poor use of land. The doctrine of adverse possession can wreak havoc in recorded title transfers and is fundamentally at odds with our usual recognition and enforcement of

---

[3] Alaska's statute corresponds to the view of one court a century ago: "This idea of acquiring title by larceny does not go in this country. A man must have a bona fide claim, or believe in his own mind that he has got a right as owner, when he goes upon land that does not belong to him, in order to acquire title by occupation and possession." *Jasperson v. Scharnikow*, 150 F. 571, 572 (9th Cir. 1907).

[4] Another solution that has been proposed is to require the adverse possessor to pay for the land at a reasonable price, and so protect the record title holder with a liability rule rather than offering the record title holder no protection at all. *See* Stake, *supra*, at 2445 & n.115 (citing Thomas W. Merrill, *Property Rules, Liability Rules, and Adverse Possession*, 79 NW. U.L. REV. 1122, 1145-54 (1984)).

documented land ownership and transfers. For example, our general strict adherence to the statute of frauds is philosophically and fundamentally inconsistent with adverse possession, which requires transfer of title once its elements are met without regard to any written or recorded documents pertaining to title.

¶31 Because of the role RCW 4.16.020, RCW 7.28.070, and RCW 7.28.050 (and other statutes) play, it seems to me that, as in Minnesota, Alaska, and other states, the legislature in our state should undertake to curtail the adverse possession doctrine. I believe the doctrine should be phased out entirely, but acknowledge that the legislature may decide that an approach such as that in Alaska may better serve the people. But in either case, I do not believe we should continue with our current outdated and inapposite law.

¶32 Although I agree that the result reached by the majority is compelled by our present law on adverse possession, I urge the legislature to reconsider the doctrine.

WIGGINS, J., concurs with MADSEN, C.J.