# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MARK MATTHEWS, | No. 58841-2-II |
| Appellant, | |
| v. | |
| TERRENCE WILLIAMS, | UNPUBLISHED OPINION |
| Respondent, | |
| MICHELLE COLBERN, | |
| Defendant. | |

PRICE, J. — Mark Matthews appeals the trial court's decision denying his claim of adverse possession against Terrence Williams. Matthews argues that (1) the trial court erred in not mandating a mediation hearing, (2) the trial court erred in admitting geographic information system (GIS) photographs and in refusing to hear his objection to those photographs, (3) the trial court erred in numerous factual contentions by misapplying the elements of adverse possession, (4) the trial court was not impartial, and (5) the trial court erred in quieting title to a discrete sub-portion of his overall claim for Williams' property (a portion approximating 44 square feet outside Williams' fence). Finally, Matthews contends the trial court erred in awarding attorney fees to Williams.

We affirm, but because the trial court's written findings and conclusions fail to expressly address the 44 square feet outside the fence, we remand to the trial court to clarify its ruling as to that portion of disputed area without taking additional evidence. We also affirm the trial court's award of attorney fees to Williams, but deny Williams fees on appeal.

FACTS

I.    BACKGROUND

In 2001, Williams purchased the property at 318 East 46th Street, Tacoma. In 2006, Matthews purchased the property at 4609 East C. Street, Tacoma. Williams' and Matthews' properties were adjacent to one another, with a portion of Williams' backyard abutting part of Matthews' backyard. Michelle Colbern owned the property directly next door to Williams at 312 East 46th Street, Tacoma, and her entire backyard abutted Matthews' yard.



Figure 1

Clerk's Papers (CP) at 34.

Near the rear of Williams' property was a dilapidated garage, hedges, and overgrown brush. In 2008, Williams moved out of the property and began to rent it out.

In 2018, Williams granted Sager Family Homes, Inc. a two-foot easement along the southern edge of his property to allow for installation of a retaining wall and fence in exchange for Williams' garage being torn down.[1] Pioneer Land Development performed this work that included clearing out vegetation in the area and grading the property to install the retaining wall and fence. The fence did not encompass roughly 44 square feet of Williams' property. The roughly 44 square feet (3.5' x 12') included two trees on the southwest corner of the garage.

On May 3, 2022, Matthews filed a complaint against Colbern and Williams asserting adverse possession of the areas at the southern end of both Colbern's and Williams' properties. Matthews obtained a default judgement against Colbern who stated at trial that she did not appear in the lawsuit because she "was diagnosed with advanced colon cancer and dealing with that. The—my focus was my—my health and it financially also took about everything from me, so there was just me not dealing with this at that time." 2 Rep. of Proc. (RP) at 394. Matthews' claim against Williams regarding the remaining disputed area (approximately 10' x 30' depicted roughly by the red rectangle in Figure 1) proceeded to trial.

II.    PRETRIAL

Prior to trial, Williams filed an ER 904 notice that included the GIS aerial photographs and stated, "[s]aid documents shall be deemed authentic and admissible without testimony or further identification unless objection is served within 14 days of the date of this notice pursuant to Evidence Rule 904(c)." CP at 16. Matthews did not object within 14 days. Matthews and

---

[1] Testimony established that this work began in 2018, but the document recording the easement is dated March 30, 2022.

Williams also submitted a signed, joint statement of evidence that included the GIS aerial photographs of their properties that were later admitted as evidence at trial. Matthews placed an X next to these photographs under the column that stated, "No objection." CP at 27-28.

Williams' counsel also submitted a statement that documented several attempts at settlement between Matthews and Williams and a declaration that said Matthews and Williams met over lunch to discuss settlement, but no agreement was reached.

At the beginning of trial, Williams moved to admit several aerial photographs that were included in the joint statement of evidence. The following exchange took place:

> [MATTHEWS]: I'd like to object to the aerial photos.
> THE COURT: Okay. Did you already agree to these, sir?
> [MATTHEWS]: Yeah, but I was wondering if I could change my mind.
> [WILLIAMS' COUNSEL]: And, Your Honor, no. I mean, he—Mr. Matthews signed the joint statement of evidence a month ago and without objection—
> THE COURT: Yeah.
> [WILLIAMS' COUNSEL]: —so I would move to admit these.
> THE COURT: Yeah, this was—you've signed this, sir, you know.
> [MATTHEWS]: Yeah.
> THE COURT: You know, in terms of if you want to—just because there's exhibits that are admitted, you know, you can argue that, you know, they don't— they're not—I mean, you already agreed to this, and the—
> [MATTHEWS]: I get it.
> THE COURT: Yeah, and I have a feeling that the parties were, kind of, trying to work cooperatively so that we—the trial wouldn't last quite as long and the need to lay the foundation, so okay. I see that you do understand.
> So 101 through 116 are not objected to; those are admitted.

1 RP at 18-19.

III. TRIAL

At trial, Ronald Roberts testified that from 2011 to 2019, he did landscaping maintenance work on Williams' property. Roberts stated that he did work twice a month during the summer and once a month during the winter and that he performed work such as edging, mowing, removing

apples, and trimming blackberry bushes back to the two trees behind Williams' garage. Williams also submitted receipts from his transactions with Roberts for landscaping services.

Stephanie Straughter, a tenant at Williams' property, testified that she lived there from 2013 to 2014. She stated that landscapers did work behind the garage cutting bushes back, trimming branches, and removing them approximately four times while she lived there.

Andres Haufle, who was also a tenant at Williams' property from 2014 to 2023, testified that he saw landscapers go behind the garage to trim and remove sticker bushes.

Williams testified that he did the landscaping on his property while he lived there. He stated that "[t]he disputed area was behind the garage where the hedges went all the way across, and then there was a gap in between those hedges, maybe four feet or so." 2 RP at 277. Williams stated he would trim the lower leaves off the "tree that's in the corner of [his] neighbor's yard" because they hung over his garage. 2 RP at 279. Williams also testified that he went into the disputed area to clear out the bushes and dump grass clippings approximately once every seven to ten days in the summer and around once a month in the winter.

Williams also testified regarding the two trees behind his garage (in the 44 square feet) as follows:

> [WILLIAMS' COUNSEL]: Okay. How, if at all, did you consider those trees to be part of your property?
> [WILLIAMS]: These trees, I never even considered to be part of my property because if you—if you look, you can kind of see where my garage is so that's the edge of my garage but this tree, as Mr. Matthews said yesterday, kind of like, had three trees growing out of one trunk; so it seems when you look at it, it—it seems as it was originally planted at my neighbor's house.
> . . . .
> And just over time, it grew over onto the property line and just came—just came over across my line; so the whole tree is not actually in my yard. So I automatically assumed that it was my neighbor's tree.
> [WILLIAMS' COUNSEL]: Were you worried at all about somebody cutting it down?

5

[WILLIAMS]: No. I—I never thought about anybody ever cutting it down because it wasn't my tree; it wasn't my concern. The only thing I did was cut the— trim up the leaves off the garage from—or the branches off the garage from time to time.

2 RP at 292-93.

In closing, Williams' counsel stated:

The 44 square feet that is outside the existing fence, in other words, basically, those two, kind of, tree trunks that my client—you know, if a little bit of his—the true property line actually bisects the tree and not—he doesn't care about that, but with the existing fence, what is on the inside of the existing fence is his property.

3 RP at 516.

After considering testimony and evidence from Matthews, Williams, and their witnesses, the trial court made detailed oral findings that Matthews did not meet the elements of adverse possession.

The court orally quieted title to Williams. Matthews then asked if the new legal description excluded the 44 square feet. The trial court responded:

No, I do not believe it does. I believe, though, that—and that's a very good issue, sir.
[Williams' counsel], what is your client's position on that; does he want to give up those 44 square feet which would encompass the trees? Do you want to have a conversation with him about that?
[WILLIAMS' COUNSEL]: No, Your Honor. My client does not wish to give that property up.
THE COURT: Okay. All right. That's the answer.

4 RP at 536-37.

Based on the findings, the trial court concluded that "Williams [] presented evidence that his possession of the disputed area was as any urban landowner would use the back corner of his lot" and that Matthews failed to show that he had exclusive, hostile, and continuous possession of the land. CP at 70. The trial court stated that Matthews "failed to show that he gave [Williams]

actual notice of his occupation of the land and that he used the land such that [Williams] would be on notice of his occupation." CP at 69. The trial court ultimately concluded that Matthews did "not adversely possess[] the disputed area" and Williams was entitled to attorney fees and costs pursuant to RCW 7.28.083. CP at 70. The trial court denied Matthews' adverse possession claim and quieted title of the disputed area to Williams. The trial court also awarded Williams $29,283.84 in attorney fees and costs.

Matthews appeals.

## ANALYSIS

I.   MEDIATION

As an initial matter, Matthews argues that the trial court erred in not mandating mediation pursuant to Pierce County Local Rules (PCLR) 16(c)(1). Williams argues that, because Matthews failed to raise this issue with the trial court, this issue was not preserved for appeal. We agree with Williams.

We generally only review errors raised before the trial court. *See* RAP 2.5(a). With few exceptions, only claims alleging lack of trial court jurisdiction, failure to establish facts upon which relief can be granted, and manifest constitutional error may be raised for the first time on appeal. *Id.* For an error to be raised before the trial court, the issue must have been adequately argued so as to "afford[] the trial court an opportunity to rule correctly on a matter before it can be presented on appeal." *State v. Lazcano*, 188 Wn. App. 338, 356, 354 P.3d 233 (2015), *review denied*, 185 Wn.2d 1008 (2016). "The rule serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials, facilitates appellate review by ensuring that a complete record of the issues will be available, and

prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to address." *Id.*

Here, Matthews did not sufficiently raise this issue below for us to consider it.[2]

II.     ADMISSION OF GIS PHOTOGRAPHS

Matthews argues the trial court erred in admitting GIS photographs and refusing to hear his objection to those photographs.  We disagree.

A.     Legal Principles

"The trial court has wide discretion to determine the admissibility of evidence, and the trial court's decision whether to admit or exclude evidence will not be reversed on appeal unless the appellant can establish that the trial court abused its discretion." *State v. Quaale*, 177 Wn. App. 603, 610, 312 P.3d 726 (2013), *aff'd*, 182 Wn.2d 191, 340 P.3d 213 (2014).  An abuse of discretion occurs when a court's decision is " 'manifestly unreasonable or based upon untenable grounds or reasons.' " *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)).

B.     Analysis

Here, Matthews did not object to the GIS aerial photographs in Williams' ER 904 notice within 14 days which rendered the photographs authentic and admissible.  Further, Matthews signed a joint statement of evidence that included the GIS photographs, and he specifically did not

---

[2] But even if we did consider Matthews' argument, it would still fail.  Williams' counsel submitted a statement that documented the verbal attempts at settlement between Matthews and Williams. Williams' counsel also submitted a declaration that stated Matthews and Williams met over lunch to discuss settlement and exchanged offers, but no agreement was reached.  While PCLR 16(c)(1) should be seen as providing trial courts with broad discretion to fashion appropriate alternatives for dispute resolution, nothing in the rule expressly requires more than occurred here.

object to them. As such, it was not unreasonable for the trial court to admit the photographs and refuse to hear Matthews' later objection to them. Therefore, the court did not abuse its discretion.

III.    ADVERSE POSSESSION

A.    Standard of Review

Adverse possession presents a mixed question of law and fact. *Anderson v. Hudak*, 80 Wn. App. 398, 401-02, 907 P.2d 305 (1995). Where a trial court has weighed the evidence, our task on review is "limited to determining whether substantial evidence supports the findings and, if so, whether the findings in turn support the trial court's conclusions of law." *Org. to Pres. Agric. Lands v. Adams County*, 128 Wn.2d 869, 882, 913 P.2d 793 (1996). "Substantial evidence is that quantity of evidence sufficient to persuade a rational, fair-minded person that a finding is true." *Casterline v. Roberts*, 168 Wn. App. 376, 381, 284 P.3d 743 (2012). The issue of whether the findings support the conclusions is reviewed de novo. *Scott's Excavating Vancouver, LLC v. Winlock Props., LLC*, 176 Wn. App. 335, 341-42, 308 P.3d 791 (2013), *review denied*, 179 Wn.2d 1011 (2014). "We defer to the trier of fact on issues of witnesses' credibility and the persuasiveness of the evidence." *State v. Perez*, 139 Wn. App. 522, 532, 161 P.3d 461 (2007).

B.    Legal Principles

"The doctrine of adverse possession permits a party to acquire legal title to another's land by possessing the property for at least 10 years in a manner that is '(1) open and notorious, (2) actual and uninterrupted, (3) exclusive, and (4) hostile.' " *Gorman v. City of Woodinville*, 175 Wn.2d 68, 71, 283 P.3d 1082 (2012) (quoting *ITT Rayonier, Inc. v. Bell*, 112 Wn.2d 754, 757, 774 P.2d 6 (1989)).

9

"A claimant can satisfy the open and notorious element by showing either (1) that the title owner had actual notice of the adverse use throughout the statutory period or (2) that the claimant used the land such that any reasonable person would have thought he owned it." *Riley v. Andres*, 107 Wn. App. 391, 396, 27 P.3d 618 (2001). The claimant must have actual and uninterrupted possession of the disputed property for the statutory period. *Ofuasia v. Smurr*, 198 Wn. App. 133, 143, 392 P.3d 1148 (2017). "To interrupt adverse possession, there must be actual cessation of the possession. *Id.* at 144. To satisfy the hostility element, a claimant must show they " 'treat[ed] the land as [their] own as against the world, throughout the statutory period.' " *Id.* (internal quotation marks omitted) (quoting *Nickell v. Southview Homeowners Ass'n*, 167 Wn. App. 42, 50, 271 P.3d 973, *review denied*, 174 Wn.2d 1018 (2012)).

"Generally, shared occupancy of disputed property by the adverse possessor and the title owner precludes 'exclusive' possession." *Crites v. Koch*, 49 Wn. App. 171, 174, 741 P.2d 1005 (1987). However, a claimant's possession need not be absolutely exclusive for purposes of adverse possession; rather, it must be "of a type that would be expected of an owner under the circumstances." *Id.* Because the presumption of possession lies with the holder of legal title, the party claiming adverse possession "has the burden of establishing the existence of each element." *ITT Rayonier, Inc.*, 112 Wn.2d at 757. Failure of proof on one element, precludes a finding in the claimant's favor. *See Gorman*, 175 Wn.2d at 72 (explaining that all of the elements of adverse possession must be established for a claim to be successful).

C.      Analysis

Matthews appears to assign error to the trial court finding he did not satisfy the elements of adverse possession. We address only the court's findings on exclusivity and conclude that

10

substantial evidence supported the trial court's finding that Matthews failed to show exclusive possession.

In its oral ruling regarding exclusivity, the trial court found that Williams' testimony that he maintained the area behind his garage was credible. The trial court also found Roberts, Haufle, and Straughter credible and found that the "evidence [did] not support, by a preponderance of the evidence . . . that [] Matthews had exclusive possession of the 10-by-30 area at issue for a continuous ten years." 4 RP at 532.

The trial court's written findings of fact included the following:

> 6. The court has previously issued in this case a default judgment quieting title to [Matthews] on his adverse possession claim against Defendant Michelle Colbern.
> 7. The remaining area in dispute for purposes of trial is a roughly 10 x 30-foot rectangle at the southwest corner of Williams' lot, which is entirely enclosed by [Williams'] fence and contiguous on the south and west sides with the Williams-Matthews property boundaries.
> 8. The testimony of [Williams] and his witnesses, as well as the landscape receipts admitted into evidence, establish that [Williams] and his landscapers tended to and maintained the disputed rectangle since 2001. As such, [Matthews] did not exclusively occupy the disputed area.
> 9. No fence or other boundary marker were ever present in the disputed area. [Matthews] made no attempt to exclude others, including the true owner.
> 10. The testimony of [Williams] and his witnesses and the aerial photographs established that neither [Matthews] nor [Williams] nor any third person significantly cleared trees in the disputed area until at least 2020. All of the photographic evidence that [Matthews] presented dates from 2018 at the earliest.
> 11. [Williams] testified that he never knew of . . . Matthews and never saw him or any other person working in or tending to the disputed area.
> 12. [Williams] testified that he never knew or was aware that anyone was occupying the disputed area.
> 13. [Matthews] never established that he physically and openly occupied the disputed area, excluded others therefrom, and tended to the disputed area for 10 consecutive years.
> 14. In viewing the photo[graph]s, [Matthews] did not establish his use, be that as it may, as being continuous as opposed to sporadic.
> 15. [Matthews'] survey shows conclusively that the disputed area falls entirely within [Williams'] property boundaries.

CP at 67-68.

11

Assuming that Matthews has assigned error to the trial court's finding that his possession was not exclusive, as well as the underlying factual findings supporting it, we conclude, following our review of the entire record, that these findings were supported by substantial evidence. For example, Williams testified that he did landscaping work in the disputed area multiple times a year including trimming leaves and sticker bushes and dumping grass clippings. Roberts testified he did landscaping work on Williams' property from 2011 to 2019 including in the disputed area. Straughter and Haufle corroborated this when they stated they observed landscapers doing work in the disputed area during the times they lived there from 2013 to 2023. The trial court found this testimony credible and was entitled to give it weight. This evidence regarding Williams' possession and use of the disputed area was sufficient to persuade a rational, fair-minded person that Matthews' alleged possession was not exclusive. Accordingly, substantial evidence supported the trial court's findings.

We focus next on whether these findings of fact support the corresponding conclusions of law. They do. On the basis of these factual findings, the court concluded that "Williams . . . presented evidence that his possession of the disputed area was as any urban landowner would use the back corner of his lot" and that Matthews failed to show that he had exclusive possession of the land. CP at 70. The trial court ultimately concluded that Matthews did "not adversely possess[] the disputed area" and that Williams was entitled to attorney fees and costs pursuant to RCW 7.28.083. CP at 70. We see no error.

Because Matthews had to prove each element of adverse possession to succeed on his claim, and he failed to prove exclusivity, the trial court properly concluded that he did "not adversely possess[] the disputed area." CP at 70. In light of our conclusion that his claim for adverse possession fails at the exclusivity element, and therefore fails in its entirety, we need not

address the remaining assignments of error that relate to the trial court's findings and conclusions regarding Matthews' adverse possession claim as to the disputed area.

IV.     THE ROUGHLY 44 SQUARE FEET

Matthews' separately argues the trial court erred in quieting title of the 44 square foot area outside Williams' fence to Williams. We disagree that Matthews has established this alleged error, but we agree that the trial court's written findings and conclusions fail to expressly address this portion of the disputed area.

The trial court's written findings described the disputed area as "entirely enclosed by [Williams'] fence." CP at 68. By defining the disputed area in this manner, the written findings do not expressly address the 44 square foot section identified by Matthews (even though we acknowledge the trial court orally addressed the 44 square foot area in oral comments). Thus, we remand for the trial court to clarify, on this record, its written findings and to expressly address the 44 square feet. Because we merely order clarification, something the trial court can do on the existing record, the trial court need not take additional evidence.

V.      COURT'S IMPARTIALITY

Matthews argues the trial court was biased toward Williams because the court agreed with Williams' counsel's reasoning on various issues at trial. Matthews also argues the trial court was biased by Colbern's testimony about her health. We disagree.

A.      Legal Principles

"Due process entitles parties in both civil and criminal cases to 'an impartial and disinterested tribunal.' " *Tacoma S. Hosp., LLC v. Nat'l Gen. Ins. Co.*, 19 Wn. App. 2d 210, 217, 494 P.3d 450 (2021) (internal quotation marks omitted) (quoting *Tatham v. Rogers*, 170 Wn. App. 76, 90, 283 P.3d 583 (2012)), *review denied*, 198 Wn.2d 1041 (2022). We presume a trial judge

performed their " 'official duties without bias or prejudice.' " *Id.* at 218 (quoting *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 692, 101 P.3d 1 (2004)). "The party seeking to overcome that presumption must provide specific facts establishing bias." *Davis*, 152 Wn.2d at 692. Further, "[j]udicial rulings alone almost never constitute a valid showing of bias." *Id.*

### B. Analysis

Matthews points to several instances in which he claims the trial court did not act independently. However, the fact that the trial court disagreed with Matthews and agreed with Williams does not establish that the court failed to act impartially. Further, nothing in the record suggests the trial court was biased in its decision making as a result of Colbern's testimony about her health. And Matthews has pointed to nothing in the record that overcomes the presumption that the trial court was impartial. Therefore, Matthews' argument fails.

## VI. ATTORNEY FEES

Matthews argues the trial court erroneously awarded Williams attorney fees. We disagree.

"[W]e apply a two-part review to awards . . . of attorney fees: (1) we review de novo whether there is a legal basis for awarding attorney fees . . . [and] (2) we review a discretionary decision to award or deny attorney fees and the reasonableness of any attorney fee award for an abuse of discretion." *Gander v. Yeager*, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012).

RCW 7.28.083(3) provides that

> [t]he prevailing party in an action asserting title to real property by adverse possession may request the court to award costs and reasonable attorneys' fees. The court may award all or a portion of costs and reasonable attorneys' fees to the prevailing party if, after considering all the facts, the court determines such an award is equitable and just.

Williams was the substantially prevailing party below, and he was awarded attorney fees and costs pursuant to RCW 7.28.083. Because RCW 7.28.083(3) provided a legal basis to award

14

attorney fees and costs, and Williams satisfied the statutory criteria entitling him to attorney fees and costs, the court did not abuse its discretion in awarding them.

In the last paragraph of his response brief before his conclusion, Williams requests attorney fees on appeal. However, RAP 18.1(b) requires a party to dedicate a separate section in their brief to the request of attorney fees on appeal. Because Williams does not comply with RAP 18.1(b), his request is denied.

## CONCLUSION

We affirm the trial court's denial of Matthews' adverse possession claim as to the disputed area within Williams' fence. However, because the trial court's written findings and conclusions fail to expressly address the 44 square feet outside the fence, we remand to the trial court to clarify its ruling as to that sub-portion of the disputed area. We affirm the trial court's award of attorney fees and costs to Williams, but deny his fees on appeal.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Price, J.

I concur:

_____
Glasgow, J.

15

VELJACIC, A.C.J. (Dissent in part) — I agree with the majority that the trial court's findings regarding the area inside the fence are supported by substantial evidence. I agree that Mark Matthews did not establish exclusivity with regard to the area inside the fence. I also agree that the trial court made no findings regarding the 44 square feet outside Terrence Williams's fence. I depart with the majority on what to do from there. I would remand for further factfinding to include the taking of additional evidence.

We should not remand for further factfinding when further factfinding would be useless. *Heriot v. Lewis*, 35 Wn. App. 496, 502, 668 P.2d 589 (1983) ("We will not . . . remand for further factfinding when to do so would be a useless act, *e.g.*, where there is *undisputed*, competent evidence in the record supporting a party's claim."). But where further factfinding would not be useless, as where evidence in the record is disputed, remand for further factfinding is appropriate. *See id.* (explaining that where evidence was uncontroverted and undisputed, remand for additional factfinding was not necessary).

Additional facts are helpful. The roughly 44 square feet (3.5' x 12') included two trees southwest of the garage. This is evident when viewing the dog-legged path of the fence, which avoids the two trees at the center of the factual dispute regarding the 44 square feet. Exhibit 28 is illustrative.



Williams testified he based his southern property line on the hedge and that he did not go on the back side of the hedge.

As the majority notes, Williams testified that he did not think the two trees behind his garage on the southwest corner of his property (in the 44 square feet as shown in the above photo) were his.

> [WILLIAMS' COUNSEL]: Okay. How, if at all, did you consider those trees to be part of your property?
>
> [WILLIAMS]: These trees, I never even considered to be part of my property because if you—if you look, you can kind of see where my garage is so that's the edge of my garage but this tree, as Mr. Matthews said yesterday, kind of like, had three trees growing out of one trunk; so it seems when you look at it, it—it seems as it was originally planted at my neighbor's house. . . . And just over time, it grew over onto the property line and just came—just came over across my line; so the whole tree is not actually in my yard. So I automatically assumed that it was my neighbor's tree.
>
> [WILLIAMS' COUNSEL]: Were you worried at all about somebody cutting it down?
>
> [WILLIAMS]: No. I—I never thought about anybody ever cutting it down because it wasn't my tree; it wasn't my concern. The only thing I did was cut the—trim up the leaves off the garage from—or the branches off the garage from time to time.

2 Rep. of Proc. (RP) at 292-93. Matthews asked Williams if the "big tree" (in the 44 square feet) was part of the disputed area and Williams responded:

> I don't think so because I believed it to not be my tree because the majority of the trunk is in the neighbor's yard, and—and just because it's so big, it—it grew into my yard on the property line. So that tree, I mean, I guess you can kind of say it might be in our—between me and you's [sic] disputed area, but the actual trunk that you cut down, that actually is on the—the—Mrs. Colbern's side.

2 RP at 309.

The trial court's findings described the disputed area as "entirely enclosed by Defendant's fence." Clerk's Papers at 68. In Williams's brief on appeal, he also states that "[t]he fence enclosed Williams'[s] parcel completely, including the disputed area, and was completed in 2022." Br. of Resp't. at 8. As is evident from a review of the trial court's findings, the court made no findings as to any part of the disputed area outside of Williams's fence (the 44 square feet). Williams even testified he did not consider the trees in the 44 square feet as his and did not think the "big tree" was part of the disputed area. 2 RP at 292-93, 309. The court's findings of fact reference only the area contained within the fence, and exclude this 44 square feet area. The result is that the court's late coming addition of this area to the order is not supported by substantial evidence; instead, it appears the area was included after a question by Matthews.

After the court orally quieted title to Williams, Matthews asked if the new legal description excluded the 44 square feet. Again, as the majority notes, the trial court responded:

> No, I do not believe it does. I believe, though, that—and that's a very good issue, sir.
> [Williams'[s] counsel], what is your client's position on that; does he want to give up those 44 square feet which would encompass the trees? Do you want to have a conversation with him about that?
> [WILLIAMS' COUNSEL]: No, Your Honor. My client does not wish to give that property up.
> THE COURT: Okay. All right. That's the answer.

18

4 RP at 536-37.

      As the facts set out above and the court's opinion show, the evidence in the record is very much disputed.  Accordingly, I would remand for further factfinding to include taking of additional evidence.

_____, J.
Veljacic, A.C.J.